31 C.C.P.A.(Patents)

## ARNESS v. FRANKS.

**Patent Appeal No. 4760.**

Court of Customs and Patent Appeals.
July 15, 1943.

Rehearing Denied Oct. 4, 1943.

John Howard Joynt, of Washington, D. C., for appellant.

Eugene L. Greenewald, of New York City (John F. Hohmann and Donald C. Harrison, both of New York City, of counsel), for appellant.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

GARRETT, Presiding Judge.

This is an appeal from the decision of the Board of Interference Examiners of the United States Patent Office holding that the party Arness is not entitled to make the counts, three in number, involved in an interference, and awarding priority to the party Franks.

The interference was declared between an application of Arnes, serial No. 215,-061, filed June 21, 1938, and a patent, No. 2,120,554, issued to Franks June 14, 1938, on an application filed June 8, 1935.

It is alleged in the Arness application that it "is a division of my copending application 96,539, filed August 17, 1936 * * * which is in turn a continuation in part of my copending application No. 645,637 filed December 3, 1932 * * *." (Application No. 96,539 is not included in the printed record before us but, as the issue finally developed, it does not appear that is was necessary to include it.)

When Arness filed his application, serial No. 215,061, he included therein three claims copied from the Franks patent and requested that an interference be declared. The Primary Examiner held that Arness could not make the claims in the form as copied (this decision is not included in the record before us) and they were amended (apparently, on August 22, 1939) to the present form of the counts in issue, which read:

"1. Alloy steel having good impact strength, and containing about 22% to 30% chromium, carbon in amounts not exceeding 1% at least 0.1% and not over 0.2% nitrogen distributed substantially uniformly throughout the steel, and at least 0.25% but not over 3% metal selected from the group consisting of nickel, and mixtures of nickel and copper; the remainder being substantially all iron.

"2. Alloy steel having good impact strength, and containing about 22% to 30% chromium, carbon in amounts not exceeding 1%, at least 0.1% and not over 0.2% nitrogen distributed substantially uniformly throughout the steel, and at least 0.25% but not over 3% of nickel, the remainder being substantially all iron.

"3. A wrought article of alloy steel having good impact strength, and containing about 22% to 30% chromium, carbon in amounts up to about 0.3%, at least 0.15% and not over 0.2% nitrogen distributed substantially uniformly throughout the steel, and at least 0.25% but not over 3% nickel; the remainder being substantially all iron."

In a decision dated August 26, 1939, the examiner rejected the claims as amended,

saying: "Claims 1, 2 and 4 [claim 4 subsequently became count 3 of the interference] are again further rejected as being unsupported by the specification. There is no statement in the specification as to the specific range of nickel set out in claims 2 and 4, or as to the specific range of the nickel-copper mixture set out in claim 1. The statements made in the last two paragraphs of the last Office action are repeated. The examiner has carefully considered applicant's argument, but is still of the opinion that the present application is not a division of application No. 96,539, and that applicant has not traced a basis for the claims through his two prior applications which would antedate the filing date of the Franks patent."

Upon appeal by Arness the Board of Appeals in a decision (of course, ex parte) dated September 11, 1940, reversed the examiner, holding, in effect, that Arness was entitled to rely upon his parent application, serial No. 645,637; that it supported the amended claims, and added: "It is a matter for the examiner to determine whether these claims are a proper basis for interference with corresponding claims of the Franks patent."

The interference was declared October 7, 1940.

It does not appear from the record whether preliminary statements were filed, but on February 1, 1941, Franks moved to dissolve, and on February 3, 1941, Arness entered a motion (supplemented by a second motion dated March 1, 1941) to shift the burden of proof.

In a decision rendered April 14, 1941, the Primary Examiner denied the motion of Franks to dissolve, and granted the motion of Arness to shift the burden of proof.

It may be said here that before the Primary Examiner Franks advanced three grounds upon which his motion for dissolution was based, but as the matter was presented to the Board of Interference Examiners, the only question involved before it was, as stated by it, "the sufficiency of the Arness application serial No. 645,637 to support the counts," and that is the only issue before us.

After the motion to shift the burden of proof was granted, it was incumbent upon Franks as the junior party to prove priority by a preponderance of evidence. He took no testimony (nor did Arness) but submitted the case to the Board of Interference Examiners upon the contention that Arness could not make the counts, which, under the facts here appearing, constituted a question ancillary to priority.

In his decision denying the motion to dissolve, the examiner expressed the belief "that Arness application No. 645,637 supports the counts of the Interference."

We thus have a situation in which there was a difference of view between tribunals of the Patent Office, the examiner and the Board of Appeals, on the one hand, being of opinion that the disclosure of Arness supports the counts, and the Board of Interference Examiners, on the other hand, being of opinion that it does not support them.

In its decision the Board of Interference Examiners made no reference to the holding of the Primary Examiner or to that of the Board of Appeals.

As we understand it, the alloy of the counts is one commonly referred to as "stainless," or "rustless," steel.

The opening paragraph of the Franks patent states: "This invention relates to *ferritic* chromium steels that possess great toughness and excellent resistance to corrosion and oxidation at elevated temperatures. (Italics ours.)"

In the Arness application, serial No. 645,637, it is said:

"Preferably the proportions of ingredients added are such as to give a ferrous alloy analyzing approximately 10% to 30% chromium, .06% to .30% carbon, and .03% to .20% nitrogen for the *ferritic* iron chromium alloys (or chromium up to 30%, nickel up to 30%, carbon below .30%, and nitrogen between .03% and .20% for the *austenitic* iron-chromium-nickel alloys). The particular quantity of the alloying metals together with the precise amount of carbon and nitrogen present are largely determinant of the physical characteristics of the alloy as will appear more fully hereinafter." (Italics ours.)

It will be observed that nickel is not mentioned as an ingredient of *ferritic* alloys, but that "nickel up to 30%" is designated as an ingredient of *austenitic* alloys. In an illustration immediately following the above quotation "8% nickel" is named as an ingredient. It is assumed that the process described in the illustration produced *austenitic* alloys.

In the brief on behalf of Franks before us it is urged that the Arness disclosure is.

limited to *austenitic* chromium nickel steels, and does not suggest that nickel be added to ferritic chromium steels.

The counts are not limited to "ferritic" or "austenitic" steels, but, as we understand the decision of the Board of Interference Examiners, that tribunal regarded it proper to consider the distinction between the alloys described by those terms because of its bearing on the matter of the Arness disclosure, particularly the disclosure as to the amount of nickel.

The Board of Interference Examiners in the beginning of its decision expressed the view that "Since the counts, in effect, originated in the Franks patent, it is necessary to consider the patent disclosure in construing the claims," and an analysis of certain parts of the patent specification was made. It was pointed out that with reference to the quantity of nickel and copper there was specified, "a content of nickel or copper, or both, between about 0.25% and about 3%," and it was particularly emphasized that each of the counts contains language which limits the quantity of metal (whether nickel or copper or a mixture of the two) to "at least 0.25% *but not over 3%.*"

The decision then continued:

"Prior to Franks' invention it was well known that the addition of nickel to high-chromium steels increased their toughness, and chromium-nickel steels have been used with a variety of percentages and proportions of these two alloying elements. It also appears from Franks' own specification that he considered it old to improve the toughness of high-chromium steels by adding nitrogen. The essence of the invention disclosed in the Franks' patent, therefore, appears to us not to be merely that the toughness of a high-nitrogen, high-chromium steel can be increased by adding copper or nickel, but that when a small percentage of copper or nickel is added to such a steel, the increase in toughness is far greater than one would expect from a knowledge of the effect of nickel on ordinary high-chromium steels. The claims in the Franks patent, therefore, appear to set forth a narrow range of copper, nickel, or both, as the case may be which increases the impact strength of the alloy to an unexpected degree, and the copper and nickel percentages in the counts in interference must be similarly construed.

"From the specification in application serial No. 645,637, it appears that the invention disclosed by Arness was developed in a manner just opposite to that employed by Franks. Arness appears to have discovered that both high-chromium and high-chromium nickel steels could be toughened by the addition of nitrogen. However, his first reference to chromium-nickel alloys on page 2 of his specification did not refer to such alloys generally but to 'austenitic' chromium-nickel alloys, and his preferred carbon range given at the bottom of page 4 is 'below .30%.' It appears from Monypenny's 'Stainless Iron and Steel,' second edition, 1931, that austenitic chromium-nickel alloys (without a high nitrogen content) cannot be produced with less than about 5% nickel when the chromium content is around 20% and the carbon content as low as 0.3%, and that the necessary nickel content required to produce an austenitic alloy increases markedly as the chromium content is either materially raised above or reduced below 20%. The percentage of nickel necessary to produce an austenitic chromium steel appears to drop as the amount of carbon is raised to around 0.5%. * * * Thus, by referring to 'austenitic' chromium-nickel steels with a preferred carbon range of 'below 0.3%,' Arness appears at the outset not to have contemplated nickel percentages as low as 3%. While he stated that the amount of nickel could be 'up to 30%,' (bottom page 4) this could not in any event constitute a clear suggestion of amounts below 3%, and, for the reasons explained, it is not believed even to imply that nickel percentages as low as 3% possess any special advantage. It is also noted that the only example given by Arness * * * comprised 8% nickel and only 18% chromium as compared to a nickel range of .25% to 3% and a chromium range of 22% to 35% set forth in the counts.

* * * • * * *

"Considering the specific portions of the early Arness application which have been discussed above and the tenor of the entire application as filed, it is apparent that there is no suggestion of adding small amounts (not over 3%) of nickel, copper, or both to a high-nitrogen, high chromium steel and no suggestion that such small amounts of nickel or copper produce any unexpected improvement in impact resistance. If it appeared that the addition of still larger amounts of nickel than the range set forth in the counts produces a corresponding, substantial, further increase in impact resistance, the conclusion might be warrant-

ed that the range in the counts is not critical and that a disclosure of '8% nickel' or 'up to 30%' embraces the same inventive concept. However, this has not been made to appear. Franks disclosed an allegedly significant limited range and limited his claims accordingly. Arness, in his early application, showed no recognition that any special advantage resides in limiting the nickel range to small percentages. In referring only to 'austenitic' chromium-nickel steels he impliedly had reference only to relatively higher nickel ranges. He disclosed no examples falling even close to the nickel range in the counts. In short, his disclosure suggests nothing more specific than that the addition of controlled amounts of nitrogen to high-chromium and high-chromium nickel steels generally produces an undisclosed degree of improvement in toughness without materially affecting their corrosion resistance. * * *"

Our interpretation of the foregoing is that the Board of Interference Examiners regarded the use of not over 3% of nickel (or copper, or mixed nickel and copper) as being critical and since Arness nowhere in his application, No. 645,637, disclosed use of less than 8% of such metals he may not prevail.

It is argued on behalf of Arness, in effect, that the counts are not ambiguous; that the "not over 3%" feature is not critical and that the disclosure in his application of the use of nickel, etc., "up to 30%" is inclusive of "not over 3%."

It may be conceded that "up to 30%" is inclusive of "not over 3%," but it does not seem to us (particularly if "not over 3%" is a critical feature) that the broad language "up to 30%" may be held a sufficient disclosure, nor do we think that the "8%" stated in the application constitutes disclosure of "not over 3%."

The "not over 3%" feature is a distinct limitation in all three of the counts and we are unable to see wherein "up to 30%" (which means anything from zero to 30%) would teach those skilled in the art to limit the quantity to "not over 3%," nor are we able to see how those skilled in the art would be taught not to use over 3% by the recitation of "8%" in the illustration given in the application referred to above.

We have not overlooked the fact, strongly emphasized by Arness, that the Board of Appeals in the ex parte proceeding held that the Arness parent application supports the counts. In so doing that tribunal said inter alia: "The net result in both cases [that is, the result obtained by both parties] is a chrome-nickel-nitrogen steel. The range of materials disclosed by Arness, in so far as chromium and nickel are concerned, is considerably broader than that disclosed by Franks. Particularly is this true with respect to the nickel. However, from an article published by Franks before his patent was filed, it appears that beneficial results differing only in degree from those involved in the patent can be obtained where nickel is used in much higher percentages than covered by the patented claims."

The Franks article to which the Board of Appeals referred was made a part of the record in the case and certain tables therein disclose tests in which the percentages of nickel ranged from as low as 8% up to about 34%. If the counts at issue called for a percentage of nickel, etc., within those ranges we should have no hesitation, upon the record before us, in holding Arness entitled to make them; indeed, we apprehend that under such circumstances this controversy would not have arisen, or, if it had arisen, that the decision of the Board of Interference Examiners would have been different, but such is not the situation.

Upon the record before us we feel justified in concluding that the "not over 3%" feature is critical in the combination of elements as named in the counts; that it is a limitation which may not be disregarded in an interference proceeding, and that the Board of Interference Examiners correctly held that Arness could not make the counts because of lack of disclosure.

In his brief before us Arness has cited a number of court decisions, those principally relied upon being Davis et al. v. Isham et al., 71 F.2d 204, 21 C.C.P.A., Patents, 1222; Wemple and Daesen v. Peirce and Anderson, 75 F.2d 998, 22 C.C.P.A., Patents, 1064; and Becket v. Arness, 112 F.2d 1011, 27 C.C.P.A., Patents, 1251.

It is sufficient to say that the facts in those cases so differed from the facts in the instant case that those decisions are not regarded as controlling here.

The decision of the Board of Interference Examiners is affirmed.

Affirmed.

LENROOT, J., took no part in the consideration or decision of this case.