526 A.2d 975

**PUBLIC SERVICE COMMISSION OF MARYLAND**

v.

**CITY OF ANNAPOLIS.**

No. 1483, Sept. Term, 1986.

Court of Special Appeals of Maryland.

June 11, 1987.

**594**

Bryan G. Moorhouse, Gen. Counsel (Shirley L. Bigley, Asst. Gen. Counsel, on the brief), Baltimore, for appellant.

Roger D. Redden (G. Richard Dent, Baltimore, and Jonathan A. Hodgson, City Atty., Annapolis, on the brief), for appellee.

Argued before WILNER, ROSALYN B. BELL and WENNER, JJ.

WILNER, Judge.

In 1974, the General Assembly enacted a new § 8.14.1 to the Zoning and Planning article of the Code (Md.Code Ann. art. 66B). The law authorized the counties and municipal

corporations of the State to enact ordinances requiring utilities with overhead lines in historic districts to relocate those lines underground; it directly required the utilities having overhead lines in the historic districts of Annapolis and Frederick to place them underground.

Although there is little in the way of officially recorded legislative history with respect to that law, it seems evident from amendments put on during the legislative process that the principal focus of the Legislature was not so much on the desirability of burying the overhead lines as on who was to bear the cost of the work. That is the issue before us in this appeal.

There appear to be three categories of cost involved: (1) digging up the streets or sidewalks, removing the existing overhead wires and facilities, and placing them underground; (2) repaving the streets and sidewalks; and (3) reconnecting the affected customers to the underground lines. The law makes clear that the third category of cost is to be borne by the affected customers, although it authorizes the county or city to advance the reconnection costs and recover them through a special benefit assessment against property in the historic district. We are not directly concerned with that category in this case.

Initially, the bill would have required the utilities to advance the other capital costs of the relocation and to recover those costs through their general rate structure. In that regard, it proposed to enact a new § 72A to the Public Service Commission Law (Md.Code Ann. art. 78) stating:

"The Public Service Commission shall, at the time of setting rates for an affected utility, permit the inclusion in the general rate base of capital costs associated with the relocation underground of utility lines and facilities in connection with projects required by Section 8.14.1 of Article 66B of the code."

*See,* 1974 Md.Laws, ch. 651 (Sen.Bill 805).

That approach would have had the dual effect of spreading the cost among all customers of the utilities—not just

those living in the historic districts—and of possibly allowing the utilities to recover more than their actual cost,[1] and it was discarded. In its place, the Legislature recrafted proposed § 72A; as enacted, it reads as follows:

"With respect to the net capital costs associated with the relocation underground of utility lines and facilities in connection with projects required by § 8.14.1 of Article 66B of the Code, the Public Service Commission shall prescribe the amount of the monthly surcharge required to support the said costs and determine which customers of the applicable utility are subject to the surcharge, or shall include in the rate base the related net capital costs, or shall adopt any other method to appropriately apportion the costs. However, in no event shall the utility be required to pay more than 50 percent of the net capital costs. The county, municipal corporation, or Baltimore City is authorized to make appropriations for such relocation projects from any appropriate federal, State, and local funds it receives for this purpose."

It is evident from this statute that the Legislature did not intend for the utilities or their customers to bear more than 50% of the "related net capital costs" of the relocation, and that it expected any part of the cost not allocated to the utilities to come from public funds. The question is whether the Public Service Commission was authorized to direct that the *entire* cost of the relocation be paid from public funds, in particular whether, under its authority to "adopt any other method to appropriately apportion the costs," the Commission could require that the full cost of relocating the overhead lines and facilities in the historic district of Annapolis be paid by the City of Annapolis. That is what the

---

1. A utility is generally entitled to rates which, after expenses, will yield "a reasonable return upon the fair value of the company's property used and useful in rendering service to the public." Art. 78, § 69(a). Subject to the effect of depreciation, and any adjustment in the rate of return allowed, an addition to a utility's "rate base" will tend to increase revenues on a recurring basis and could result in the utility recapturing more than its initial cost.

Commission did; the Circuit Court for Anne Arundel County held that the Commission had no authority to do so. We disagree with the Circuit Court but shall affirm for other reasons.

Annapolis was not the first municipality to require the undergrounding of utility lines. A number of subdivisions, through zoning ordinances or regulations, have historically required service to new developments to be provided through underground lines. That, of course, does not involve the relocation of existing lines, but it does increase the cost of installing the new lines. In that regard, as far back as 1966, the Commission had established a general policy, reflected in Order No. 56351 in Case No. 6016, that, whenever an electric utility is required to construct its lines underground at a cost substantially higher than the cost to construct the same lines overhead, absent unusual circumstances the annual fixed cost necessary to support the excess investment "shall be imposed on all of the utility's customers receiving service *in the geographic area and/or the local subdivision to which the regulation or ordinance is applicable as a whole.*" (Emphasis in original).

Frederick was apparently the first city to take advantage of the 1974 law and require the undergrounding of existing overhead utility lines in its historic district. In that case, the Commission directed that the city pay half the relocation cost and that the other half be advanced by the utilities, to be recovered by a one-time surcharge on their customers in the city. *See Matter of the Application of the Potomac Edison Co.*, 66 P.S.C.Rep. 181, Order No. 61252 (1975).

The case now before us originated with a letter-petition from the Baltimore Gas and Electric Co. (BG & E) on April 22, 1985. The company informed the Commission that the City of Annapolis had "approached" it regarding the power lines in the historic district of the City, that the first phase of the work, near the Governor's Mansion, would cost about $175,000, and that the total project would take five years or more to complete and would cost "several million dollars." The company read the law as requiring the City to pay 50%

of the cost "with the remaining 50% to be handled either as a surcharge to customers within the Municipality, or as a rate base item." It asked the Commission to approve "rate base treatment," contending that that approach was "consistent with a long-standing Company policy" and that the cost of administering a surcharge program would be excessive.

The BG & E "petition" was referred to the Commission's technical staff for review. On June 4, 1985, the staff filed a report dated May 10, 1985, in which it objected to rate base treatment and recommended instead that the utility's cost be recovered through surcharges on BG & E's Annapolis customers. The staff seemed to accept the notion that 50% of the cost would be paid by the City and dealt only with how the other half, to be advanced by the utility, would be recovered. They observed that the Commission had never established any policy in that regard, that the C & P Telephone Co., which also had overhead lines in the historic district, had recommended the surcharge approach, and that there was some question of whether the project would actually proceed beyond Phase I ($175,000). They contended further that the surcharge method was consistent with the approach taken in the Frederick case, that it would provide greater "visibility" of the project, and that the rate base method "would authorize a continuing return to the utility whereas the customer surcharge (contribution) would not."

The Commission did not hold a formal hearing on the matter. Apparently heeding the staff recommendation, it informed BG & E, by letter of June 11, 1985, that it would not authorize rate base treatment for the undergrounding of lines in Annapolis and directed the company to provide the Commission with the total costs of the conversion, along with "detailed information as to how the Company intends to implement the surcharge on customers in the Annapolis area."

BG & E responded with two letters—one dated July 10, 1985, giving the Commission the financial information it

sought, the second dated August 13, 1985, requesting that the Commission reconsider its decision not to allow rate base treatment. In the July letter, BG & E estimated that the total Annapolis project would proceed in four phases, continuing through FY 1990. Phase I, involving only Church Circle and School Street, would cost $221,000, of which the "City's share" would be $110,500. The balance of the cost, plus $18,000 estimated for administration of the surcharging, would be spread over BG & E's 15,000 Annapolis accounts and would involve a total surcharge of $8.60/account, to be billed over a two-month period. Phases II–IV, the Company estimated, would cost about $26.4 million.

The Company's August 13 letter is not altogether clear. At one point, it refers to 12,000 Annapolis accounts rather than the 15,000 stated in the July letter. It also states that the actual undergrounding costs of Phases II–IV would be only $3.2 million (rather than $26.4 million) and that "[t]o the extent that the City would insist on more comprehensive projects, we would not expect to participate because our program is limited to $1 million annually." [2]

The Commission responded on August 21. It asserted that, since the enactment of § 72A,

"the Commission has maintained a policy whereby residents of any municipality which mandates the execution of an undergrounding project in a historic district shall pay 50% of the net capital costs associated with the project. The Commission believes that this is an equitable policy which assures that the residents who will

---

**2.** The discrepancy in the cost figures was explained later. It has largely to do with whether (1) the lines are buried in the streets or under sidewalks, and (2) the repaving is done with new brick, as desired by the City, or a less expensive method. Insofar as the Company opting not to participate, perhaps it read § 8.14.1(b) differently than we do. That section, in relevant part, says that "The Baltimore Gas and Electric Company ... shall place underground existing overhead lines and facilities within the historic area of the City of Annapolis...."

benefit from special undergrounding projects in the historic district will pay the costs of those projects"

and that

"the Commission is not persuaded that cause has been shown to modify or deviate from its established policy."

The decision to require the Company's share to be recovered by surcharge on its Annapolis customers was reaffirmed, although the Commission directed BG & E to spread the surcharge over four months rather than two. Contemporaneously with its response to BG & E, the Commission wrote to the Mayor of Annapolis informing him of the Commission's decision and suggesting that the City either reconsider the need for Phases II–IV or seek county or State assistance in defraying the cost of those phases.

On September 10, 1985, State Senator Winegrad, who represents Anne Arundel County, wrote to the Commission seeking further reconsideration. He pointed out that there had been no public notice that a decision was pending, that he and other interested persons wanted to present their views, that a State grant of $971,000 for the project had been approved by the Legislature in the 1985 General Construction Loan, and that the project might have to be abandoned if the utilities' share of the cost was placed solely on Annapolis residents. Upon receipt of Senator Winegrad's letter, the Commission decided to conduct a "legislative-type" hearing and asked that interested parties

"proffer facts and points of view about (a) the costs of the Phase I and subsequent phases of the undergrounding project; (b) the State's grant of $971,000 to the City of Annapolis to install utility lines on streets on which prominent State facilities are located, contingent upon the City of Annapolis providing an equal amount of matching funds; (c) the application of Section 8.14.1 of Article 66B and Section 72A of Article 78 to the cost of Phase I and subsequent phases; (d) considerations of equity concerning whether BG & E's ratepayers in Annapolis, Anne Arundel County, or the company's entire service territory or the taxpayers of Maryland should pay the cost of

Phase I and subsequent phases; and, (e) other matters of fact or law which are relevant to the allocation of payment of the costs of Phase I and subsequent phases."

At the hearing, held on November 14, 1985, a number of questions arose as to the precise scope of Phase I, what the cost of relocating the overhead BG & E lines would be, and how much of that cost could be defrayed by the State grant and matching City funds. The Commission was formally apprised of the terms of the State grant, as specified in the 1985 General Construction Loan item, i.e.,

"Make a grant to the City of Annapolis to install utility lines underground in Historic District on streets (including State Circle, Cornhill Street, Francis Street, School Street, Main Street to City Dock, and Hyde Alley) on which prominent State facilities are located or nearby. This grant is contingent on the City of Annapolis providing an equal amount of matching funds....... $971,000."

*See,* 1985 Md.Laws, ch. 125.

Senator Winegrad reviewed the history of attempts to secure funding for the project and asserted that the inclusion of this item in the General Construction Loan demonstrated an awareness by the State of the unique significance of Annapolis. He and counsel for the City of Annapolis purported to stipulate that a decision was sought only as to Phase I and that whatever decision was made as to that would not be regarded as binding with respect to the other phases of the work—that each phase should be reviewed independently. They also made clear their desire that only the actual cost of undergrounding, including comparable repaving but not an upgrading of the repaving, be considered and that the cost be paid as follows: 50% by the utilities, to be included in the general rate base; 25% from the State grant, and 25% from matching City funds.

The staff reiterated its position that rate base treatment was inappropriate. In response to the argument that the cost should be spread Statewide because of the unique national historical significance of Annapolis, they observed

that, as BG & E does not provide service Statewide, inclusion of the cost in its rate base would not spread it Statewide. Customers of the other electric utilities providing service on the Eastern Shore, Western Maryland, and the metropolitan Washington suburbs would have no share of it. The staff also stressed the recurrent recovery by BG & E if rate base treatment were ordered.

Given the confusion over the scope and cost of the Phase I work, the Commission sought more precise information. Following the hearing, the Commission was informed, by letters from BG & E and counsel for Annapolis, that (1) the Phase I work involved the undergrounding of lines on Church Circle and School Street, State Circle, Francis Street, Cornhill Street, Main Street, and Hyde Alley, (2) the Church Circle/School Street part had already been completed at a cost of $221,000, (3) the total Phase I cost, including the $221,000, would be $2,350,000, and (4) of that amount, they expected $587,500 to come from the State grant, $587,500 to come from City funds, and $1,175,000 to be paid by BG & E.

The Commission rendered its decision on January 31, 1986, through Order No. 67281. It recited the procedural history of the case, accepted the final cost figures supplied by BG & E and the City, and observed that, under § 72A, it had three options: rate base treatment, surcharge, or, as it characterized the third option, "any other method deemed to be appropriate." It then rejected inclusion in the rate base as inequitable to the customers of BG & E—that that option "would place the entire cost of the project on the utility ratepayers located in Baltimore City and the eight surrounding counties served by BG & E, while relieving utility customers in fifteen other counties from any financial responsibility." Recognizing the unique significance of Annapolis to the State at large, the Commission also rejected the surcharge option as inequitable—inequitable to the electric service customers in Annapolis.

It then turned to the third option, determined that the City decided to proceed with the undergrounding primarily

for aesthetic reasons and that undergrounding, while desirable, "was not necessary to the provision of electric service to customers located in Annapolis," and concluded that the City should therefore bear the utility's share of the cost. It reasoned:

> "Since the costs of the undergrounding project are unrelated to the Company's statutory obligation to provide utility service, this particular construction effort is essentially no different tha[n] other types of special construction requests submitted by residential, commercial and industrial customers. For example, when such property owners seek the movement of utility poles located on their particular property, BG & E considers these types of requests as well as the resulting costs to benefit only the individual or business entity originating the request. In these instances, the property owner is directly invoiced and is responsible for the costs incurred by BG & E in accommodating the special construction request."

The Commission assumed, at least to the extent of the $971,000 grant in the 1985 General Construction Loan, that the State would match the City's contribution, and that, under the arrangement ordered by it, the full cost of the project would be shared equally by the City and the State. Although the Order occasionally spoke specifically in terms of Phase I, its operative paragraph was not so limited. It stated simply that "[BG & E's] petition for rate base treatment of the costs associated with the relocation of overhead facilities to underground in the historic district designated by the City of Annapolis is hereby denied." Nothing was said about the cost of burying the telephone or any cable television lines.

On appeal by the City of Annapolis, the Circuit Court rejected the Commission's approach on two grounds. It held first that the third option, applied by the Commission, required that the method chosen "appropriately apportion the ... costs," that, by using the term "apportion," the Legislature "intended that more than one entity bear the cost of undergrounding the utilities," and that "[u]pon

examination of the Commission's Order, we find that Order devoid of any indication of apportionment of costs. Quite to the contrary, the Commission has directed that the City of Annapolis bear the entire burden of costs."

Though recognizing the proposition that the Commission "has great discretion in carrying out its statutory authority," that the court "will not substitute its judgment for that of the Commission," and that the Commission's order should not be disturbed "except upon clear and satisfactory evidence that it is unlawful or unreasonable," the court announced its disagreement with the Commission's findings that the undergrounding was merely aesthetic and that rate base treatment would be inequitable. It concluded that there was an economic basis for the undergrounding, that the Legislature intended "that the Utility absorb some costs," that 50/50 splits had been approved by the Commission in other cases, and that there was nothing inequitable in either surcharging Annapolis customers or rate base treatment.

That led to the second reason for rejection—lack of substantial evidence. The court stated in that regard:

"The mere fact the Commission believes that rate-base treatment or imposition of a surcharge on customers within the area may be inequitable is not controlling without specific proof or facts. We find no evidence that establishes the proposal as being inequitable. The Commission improperly assumed that the project promotes only aesthetic benefits. Lastly, the Commission, relying on its broad discretion, failed to 'apportion' costs or justify the lack thereof. Thus, we hold that the Commission's Order is not supported by substantial evidence, and is therefore unreasonable."

The Commission attacks both of these conclusions, arguing (1) that it *does* have authority under § 72A to determine that BG & E ratepayers should not bear any of the relocation costs, and (2) that its order was not arbitrary or capricious and should therefore have been affirmed.

We think that the Commission erred in applying the statute, although not precisely in the way determined by the Circuit Court; we also think that the court misinterpreted what the Commission actually did. The net effect of our view of the matter will be to affirm the judgment of the Circuit Court remanding the case for further consideration by the Commission.

In enacting § 72A in the way that it did, the Legislature very clearly rejected any fixed formula for allocating the cost of relocations in historic districts and opted instead to allow the Commission, on a case-by-case basis, to devise an equitable arrangement. The General Assembly must have been aware that the costs of undergrounding in built-up historic districts could be substantial, that they would be triggered by political decisions of the local subdivisions (or, in the case of Annapolis and Frederick, by its own political decision), that, although some benefit from the undergrounding might extend beyond the boundaries of the particular historic districts, the main effect would be local, and that, while the undergrounding would be aesthetically pleasing and might promote tourism or serve some other economic interest, it would not necessarily improve the quantity or quality of the utility service itself. We presume that the Legislature also recognized that the cost of any of these projects would have to be paid either through tax-supported public funds (local, State, or Federal) or by additional charges to the utilities' customers, that only one of the many utilities that would be involved in these relocations has a Statewide rate base (C & P Telephone Co.), that, as a result, inclusion of the costs in the rate base would not (as to the other utilities) effect a Statewide spreading of the cost, and that, because the matrix of cost and available public funding would differ from one project to another, a uniform set of rules regarding the allocation of costs might not be feasible.

■ The discretion accorded the Commission is in two interrelated parts. The Commission must decide how much of the cost of a relocation is to come from non-utility

sources and how much is to be advanced by the utilities. To the extent that it requires a contribution from the utilities, it must then decide how they may recapture their expense.

■ With respect to the first determination, we observe that, despite some suggestions to the contrary during the course of the proceeding, the law does not require a 50/50 split between utility and non-utility funds. It states merely that "in no event shall the utility be required to pay *more than 50 percent* of the net capital costs." (Emphasis added.) That provision, by its terms, leaves open the clear possibility that a lesser contribution, *or perhaps no contribution at all,* might be required from the utility, for, as a general rule of construction, the statement of a maximum does not imply the existence of a minimum. *See Wilson v. Crews,* 160 Fla. 169, 34 So.2d 114, 118 (1948), construing the phrase "not more than five" as not connoting "any requirement of a minimum number ..."; *also Application of Mochel,* 470 F.2d 638, 640 (C.C.P.A.1972), construing the analogous term "up to" as "includ[ing] zero as the lower limit."

The City does not dispute that proposition. It relies instead, as did the Circuit Court, on the provision in the first sentence of the section allowing the Commission to adopt "any other method *to appropriately apportion the costs.*" (Emphasis added.) The concept of apportionment, it argues, does connote a requirement that some "appropriate" share be paid by the utility.

Although the City's construction of that phrase is certainly a permissible one, we do not believe it is what the Legislature intended. If the General Assembly wanted to *require* some minimum contribution from the utilities in every case, it could (and, we think, would) have made that clear. As we said, it recognized that public funds might be sought for these projects and indeed authorized State and local appropriations for that purpose. Under the City's view, it would be impermissible for a legislative body or a

philanthropic organization to opt to defray the entire cost of a project with public or charitable funds.

We think that the apportionment provision, by using the word "appropriately," was intended both to set a guideline for any division between public and utility funds and, to the extent that a contribution is required from the utilities, to permit a recovery method other than solely by surcharge or solely by rate base inclusion. It no more requires a contribution from the utility than it does a surcharge or an addition to the rate base. It is part of the articulation of the Commission's discretion to consider each project on its own facts and to decide how much of the cost reasonably can and should be paid by public or other non-utility funds, how much to require the utilities to advance, which of the utilities' customers should ultimately bear the utilities' cost, and how that burden should be discharged. To the extent that the Circuit Court construed the statute as requiring some minimum contribution from the utilities, we think that it erred.

The fact is that the Commission did make an apportionment of the costs. Recalling that, by stipulation, all that the Commission was asked to consider was Phase I, the evidence showed that the anticipated cost of that phase for BG & E was $2,350,000, that the State had appropriated $971,000 for that work, and that the City expected to come up with a like amount of $971,000. The major part of the cost—$1,942,000—was apportioned between the State and City governments, in full accord with the State General Construction Loan. Given the apparent availability of those public funds, the Commission was not obliged to require BG & E customers to absorb half the cost ($1,175,000).

We believe that the Commission had the authority, under the statute, to do what it did—to assess the cost of the relocation against the collective community most benefited by the relocation, knowing that a significant part of that cost had already been pledged by the State. Our concern is not with the decision itself but rather with the basis upon which it was reached.

Having determined that the City decided to proceed with the relocation "for aesthetic reasons," the Commission jumped to the conclusion that the relocation was "not necessary to the provision of electric service to customers located in Annapolis," and, essentially for that reason, found that it was inappropriate to spread any of the cost to BG & E's customers, either through surcharging or rate base treatment.

█ As a matter of pure public utility regulation, it might be hard to argue with that approach. What the Commission apparently failed to consider, however, was that, when it comes to relocating overhead lines in historic districts, the Commission is not tied to the normal principles of utility regulation. As to that, the Legislature has stated a broader public policy, specifically allowing the Commission to allocate the cost in a way it would not ordinarily do. In what counsel for Annapolis has appropriately called an act of "political economy," the General Assembly has decided that surcharging and rate base treatment are not inherently inequitable or inappropriate methods of allocating the cost; it has made clear, at least in a generic sense, that relocation in historic districts may indeed be "different tha[n] other types of special construction requests submitted by residential, commercial and industrial customers" and may therefore be treated differently.

The reasoning set forth in the Commission's order cannot be read other than as a broad rejection of rate base treatment for historic district relocation costs, which is not only directly inconsistent with the policy expressed by the Legislature but may well end up thwarting the purpose of the 1974 Act.

For that reason, we think that a remand to the Commission is in order. Although it might end up with the same conclusion, the Commission will have to judge the matter of apportionment with due regard to the policies set by the Legislature in § 8.14.1 and § 72A and not solely in conformance with its views as to other conversions and relocations.

JUDGMENT AFFIRMED; APPELLANT TO PAY THE COSTS.