**FLINK/VULCAN, Plaintiff,**

v.

**UNITED STATES, Defendant.**

No. 99–1005C.

United States Court of Federal Claims.

Dec. 17, 2004.

Kurt M. Rylander, Vancouver, Washington, for the plaintiff.

Hillary A. Stern, Trial Attorney; Harold D. Lester, Jr., Assistant Director; David M. Cohen, Director, Commercial Litigation Branch, Civil Division; Peter D. Keisler, Assistant Attorney General, United States Department of Justice, for the defendant.

## OPINION

HORN, Judge.

### FINDINGS OF FACT

Plaintiff Flink/Vulcan, at the time of the incidents relating to this claim, was a firm under contract with the Federal Emergency Management Agency (FEMA), to provide habitability inspections of damaged residences located in declared disaster areas. This claim arises as a result of the deactivation of Project Notification 8 issued to Flink/Vulcan for inspection work relating to the Loma Prieta earthquake in California. Originally this case was assigned to the Honorable Lynn J. Bush. The case was reassigned to this judge in July, 2004.

At the times relevant to this action, Flink/Vulcan was a joint venture consisting of a Florida corporation, Flink Construction Corporation and Vulcan (a partnership between Mathias Safran of Texas and Pierre Goiran of Florida). Flink Construction Corporation is participating in this suit as part of its efforts to close out its business affairs.

FEMA awarded contract EMW–88–C–2588 to Flink/Vulcan on May 30, 1988. Under the contract, Flink/Vulcan was to perform habitability inspection services of disaster-damaged homes. The FEMA contract stated, "[t]he contractor shall, when directed by the receipt of a Project Notification (PN) and specific Work Orders (WO), provide inspections ...." A residential inspection required an inspector to visit a house within a disaster area, establish the extent of damage, and provide detailed information, generally set forth on FEMA Form 90–56. Residential habitability inspectors were required to be experienced and undergo training. The contract placed the responsibility for training inspectors on Flink/Vulcan. The contract also required that Flink/Vulcan have project supervisors and inspectors prepared to stay for the "duration" of a Project Notification.

The contract called for habitability inspections to be issued and performed on a project-by-project basis. Pursuant to the contract, FEMA would issue a Project Notification to the contractor, setting forth the estimated cost, number of inspections, period of performance, geographical scale, and other conditions. The price per inspection under the contract was $36.90. FEMA was permitted to issue a Project Notification orally or by telegram, with a later confirmation of the issuance in writing. Whether a Project Notification was issued orally or by telegram, Flink/Vulcan was required to take action, even before receiving written confirmation.

Under the contract at issue, Flink/Vulcan had to "submit, for approval and concurrence of the PM [Project Monitor], a written work plan within 24 hours after the PN [Project Notification] specified reporting time." For each Project Notification, Flink/Vulcan's Phase 1[1] Work Plan would include a sched-ule, level of performance, personnel levels, processing procedures, quality assurance methods, and on-site organization. As the disaster conditions stabilized, the work plan was modified.

The contract further stipulated that:

The contractor guarantees to provide the following maximum number of personnel under under [sic] this contract:
a. Number of Project Supervisors:          5
b. Number of Inspectors available for certification:     30

The number of concurrent Project Notifications to be issued under this contract shall not exceed   2.

The contract provided that a Project Notification could be terminated for "[f]ailure to submit an acceptable work plan," or "[w]hen an incidence rate of 10% of the work [sic] WO's [work orders] are returned to the Contractor as re-issue(s) . . . ." Additionally, the contract incorporated by reference the clause at Federal Acquisition Regulation (FAR) 52.249–4 ("Termination for the Convenience of the Government (Services) (Short Form)— April 1984"). This termination clause provided that "[t]he Contracting Officer, by written notice, may terminate this contract, in whole or in part, when it is in the Government's interest," and that once the "contract is terminated, the Government shall be liable only for payment under the payment provisions of this contract for services rendered before the effective date of termination." 48 C.F.R. § 52.249–4 (1987).

The current case arises out of Project Notification 8, issued by FEMA in response to the Loma Prieta earthquake (October 17, 1989) near San Francisco, California.[2] Ac-cording to plaintiff's certified claim letter to FEMA, on October 18, 1989, FEMA Contract Specialist Gregory Steigerwald called Mathias Safran of Flink/Vulcan to request the number of inspectors plaintiff could field in California. Also according to the plaintiff's certified claim, on October 19, 1989, Mr. Safran informed the office of Contracting Officer H. Robert Weiss that "Flink/Vulcan can provide up to 100 inspectors." On October 20, 1989, FEMA issued Project Notification 8 to the plaintiff. The notification was issued first verbally on October 20, 1989 and then in writing on October 25, 1989. In its brief addressing the cross-motions for summary judgment, the plaintiff argues that FEMA "directed" Flink/Vulcan to respond to Project Notification 8 with 100 inspectors and 10 supervisors. The defendant states that it never required any specific number of inspectors, but that Mr. Safran indicated to FEMA that Flink/Vulcan could provide up to 100 inspectors, which appears to be confirmed by plaintiff's words in its certified claim to the contracting officer.

1. Attachment I of the FEMA contract defines "project phases" as follows:

The "Period of Performance" of the PN [Project Notification] shall consist of an initial "Phase 1" (active phase) when the majority of inspections will occur and a "Phase 2" period (phase down) of the PN, when directed by the Contracting Officer. Phase 2 will normally occur when a workload of less than 7 inspections per day is anticipated and no substantial increase in work is projected. In any case, the Contractor shall be specifically notified by the Contracting Officer if Phase 2 is to be activated.

2. Flink/Vulcan filed a prior claim against the government, also arising from FEMA contract inspections. *See Flink/Vulcan v. United States*, No. 94–497C (Fed.Cl. filed June 16, 1995). In the earlier case, the parties filed an October 26, 1999, stipulation for entry of judgment, which specifically excluded Flink/Vulcan's November 15, 1994 certified FEMA claim relating to Project Notification 8 and the Loma Prieta earthquake, which is the basis for the present case. Pursuant to the parties' stipulation for entry of judgment, the court issued judgment in the earlier case on October 28, 1999, providing that Flink/Vulcan shall recover from the United States the sum of $135,000.00, inclusive of interest.

In Project Notification 8, FEMA made the following approximations: "Estimated Number of Applications [inspections]: 25,000" and "Period of Performance: 90 days." Had Flink/Vulcan performed all of the estimated inspections in the notification, it could have received remuneration estimated by FEMA at $985,000.00. At the time Flink/Vulcan was tasked with Project Notification 8, plaintiff already was performing habitability inspections under Project Notifications 6 and 7 in South Carolina and the United States Virgin Islands respectively, utilizing 5 supervisors and approximately 42 inspectors.

On October 27, 1989, FEMA approved Flink/Vulcan's Phase I work plan for Project Notification 8. The work plan appeared to identify 20 inspectors, 4 supervisors and team leaders to undertake the work, and 10 inspectors as "TBA" (to be added). By October 30, 1989—the date FEMA terminated Flink/Vulcan's Project Notification 8 inspections—the plaintiff had performed 2406 inspections. Following Flink/Vulcan's termination, plaintiff states FEMA re-assigned the remainder of the habitability inspections to the United States Army Corps of Engineers and to Scientific Services, a private contractor. Flink/Vulcan has been compensated for the 2406 inspections it completed under Project Notification 8.

On April 22, 1993, Flink/Vulcan filed with FEMA a claim for $833,718.60, representing 22,594 inspections (25,000 estimated inspections, less the 2406 inspections performed and for which plaintiff was compensated). FEMA subsequently denied the claim, emphasizing that the contract only contained an estimate of the amount of inspections Flink/Vulcan was to perform in response to Project Notification 8, and that the government retained the right to assign work in the manner it found most advantageous. In the same letter denying compensation for 22,594 inspections, FEMA stated that it had issued Project Notification 8 "during the time FEMA was responding to four separate major disaster declarations," and that the plaintiff had been encouraged "to initiate a recruitment and training program" for inspectors in conjunction with Project Notification 8.

According to the plaintiff, during its dealings with the government, FEMA stated that what it termed "extraordinary expenses" incurred by Flink/Vulcan in the advertising, recruitment, training and transportation of inspectors to respond to Project Notification 8, would be compensated "based on the receipt of supporting documentation." In November of 1994, Flink/Vulcan filed Project Notification 8–related claims with FEMA, detailing its expenses. In March of 1995, the agency requested further documentation from Flink/Vulcan to substantiate its claim for "extraordinary expenses," to which plaintiff responded. Thereafter, FEMA directed Flink/Vulcan to submit its claim for $131,471.67 of "extraordinary expenses" for an independent audit. In 1996, after reviewing the plaintiff's claims, an independent auditor recommended that FEMA compensate only $13,041.67 of the claims. The plaintiff sent an invoice for $13,041.67 to FEMA in 1998. The plaintiff alleges, however, that the $13,041.67 claim for "extraordinary expenses" has never been compensated.[3] Plaintiff also disputes the auditor's recommendation to compensate only $13,041.67. Plaintiff acknowledges that it has been paid for the 2406 completed Project Notification 8 inspections.

In its complaint, Flink/Vulcan states that the defendant owes the plaintiff $883,899.60 for the 22,594 inspections FEMA deactivated, for "extraordinary expenses" (including the amount invoiced to FEMA and never paid), as well as for "such other and further relief as the Court may deem proper," including interest and court costs. Alternatively, the plaintiff seeks recovery under a theory of constructive change.

## DISCUSSION

The parties have filed cross-motions for summary judgment on the plaintiff's complaint pursuant to RCFC 56. RCFC 56 is patterned on Rule 56 of the Federal Rules of

---

**3.** Regardless of the court's ultimate conclusions on the plaintiff's claims, the court does not condone FEMA's conduct of inviting Flink/Vulcan to submit a voucher, subjecting Flink/Vulcan to the time and expense of an audit, then not paying the audited amount.

Civil Procedure (Fed.R.Civ.P.) and is similar both in language and effect. Both rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c); Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Monon Corp. v. Stoughton Trailers, Inc.,* 239 F.3d 1253, 1257 (Fed.Cir.2001); *Avenal v. United States,* 100 F.3d 933, 936 (Fed.Cir.1996), *reh'g denied* (1997); *Creppel v. United States,* 41 F.3d 627, 630–31 (Fed. Cir.1994). A fact is material if it will make a difference in the result of a case under the governing law. Irrelevant or unnecessary factual disputes do not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 247–48, 106 S.Ct. 2505; *see also Monon Corp. v. Stoughton Trailers, Inc.,* 239 F.3d at 1257; *Curtis v. United States,* 144 Ct.Cl. 194, 199, 168 F.Supp. 213, 216 (1958), *cert. denied,* 361 U.S. 843, 80 S.Ct. 94, 4 L.Ed.2d 81 (1959), *reh'g denied,* 361 U.S. 941, 80 S.Ct. 375, 4 L.Ed.2d 361 (1960).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence and determine the truth of the case presented, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 249, 106 S.Ct. 2505; *see, e.g., Ford Motor Co. v. United States,* 157 F.3d 849, 854 (Fed.Cir. 1998) (the nature of a summary judgment proceeding is such that the trial judge does not make findings of fact); *Johnson v. United States,* 49 Fed.Cl. 648, 651 (2001), *aff'd,* 317 F.3d 1331 (Fed.Cir.2003); *Becho, Inc. v. United States,* 47 Fed.Cl. 595, 599 (2000). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 250–52, 106 S.Ct. 2505; *Jay v. Sec'y of Dep't*

*of Health and Human Servs.,* 998 F.2d 979, 982 (Fed.Cir.), *reh'g denied and en banc suggestion declined* (1993). When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Hall v. Aqua Queen Mfg., Inc.,* 93 F.3d 1548, 1553 n. 3 (Fed.Cir.1996). In such a case, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings. Summary judgment:

> saves the expense and time of a full trial when it is unnecessary. When the material facts are adequately developed in the motion papers, a full trial is useless. "Useless" in this context means that more evidence than is already available in connection with the motion for summary judgment could not reasonably be expected to change the result.

*Dehne v. United States,* 23 Cl.Ct. 606, 614–15 (1991) (citing *Pure Gold, Inc. v. Syntex, Inc.,* 739 F.2d 624, 626 (Fed.Cir.1984)), *vacated on other grounds,* 970 F.2d 890 (Fed.Cir.1992); *see also United States Steel Corp. v. Vasco Metals Corp.,* 55 C.C.P.A. 1141, 394 F.2d 1009, 1011 (C.C.P.A.1968).

Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. 2505; *Eli Lilly & Co. v. Barr Labs., Inc.,* 251 F.3d 955, 971 (Fed.Cir.2001), *cert. denied,* 534 U.S. 1109, 122 S.Ct. 913, 151 L.Ed.2d 879 (2002); *Gen. Elec. Co. v. Nintendo Co.,* 179 F.3d 1350, 1353 (Fed.Cir. 1999). In other words, if the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. at 587–88, 106 S.Ct. 1348;

*Monon Corp. v. Stoughton Trailers, Inc.,* 239 F.3d at 1257; *Wanlass v. Fedders Corp.,* 145 F.3d 1461, 1463 (Fed.Cir.), *reh'g denied and en banc suggestion declined* (1998).

The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Trilogy Communications, Inc. v. Times Fiber Communications, Inc.,* 109 F.3d 739, 741 (Fed.Cir.) (quoting *Conroy v. Reebok Int'l, Ltd.,* 14 F.3d 1570, 1575 (Fed.Cir.1994)), *reh'g denied and en banc suggestion declined* (1997); *Lockwood v. Am. Airlines, Inc.,* 107 F.3d 1565, 1569 (Fed.Cir.1997). If the moving party makes such a showing, the burden shifts to the nonmoving party to demonstrate that a genuine dispute regarding a material fact exists by presenting evidence which establishes the existence of an element essential to its case upon which it bears the burden of proof. *See Celotex Corp. v. Catrett,* 477 U.S. at 322, 106 S.Ct. 2548; *Am. Airlines v. United States,* 204 F.3d 1103, 1108 (Fed.Cir.2000); *see also Schoell v. Regal Marine Indus., Inc.,* 247 F.3d 1202, 1207 (Fed.Cir.2001).

Pursuant to RCFC 56, a motion for summary judgment may succeed whether or not accompanied by affidavits and/or other documentary evidence in addition to the pleadings already on file. *Celotex Corp. v. Catrett,* 477 U.S. at 324, 106 S.Ct. 2548. Generally, however, in order to prevail by demonstrating that a genuine issue for trial exists, the nonmoving party must go beyond the pleadings by use of evidence such as affidavits, depositions, answers to interrogatories and admissions. *Id.*

Even if both parties argue in favor of summary judgment and allege an absence of genuine issues of material fact, however, the court is not relieved of its responsibility to determine the appropriateness of summary disposition in a particular case. *Prineville Sawmill Co. v. United States,* 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Construc-*

*tors, Inc. v. United States,* 812 F.2d 1387, 1391 (Fed.Cir.1987)); *Chevron USA, Inc. v. Cayetano,* 224 F.3d 1030, 1037 n. 5 (9th Cir. 2000), *cert. denied,* 532 U.S. 942, 121 S.Ct. 1403, 149 L.Ed.2d 346 (2001). "[S]imply because both parties moved for summary judgment, it does not follow that summary judgment should be granted one or the other." *LewRon Television, Inc. v. D.H. Overmyer Leasing Co.,* 401 F.2d 689, 692 (4th Cir.1968), *cert. denied,* 393 U.S. 1083, 89 S.Ct. 866, 21 L.Ed.2d 776 (1969); *see also B.F. Goodrich Co. v. U.S. Filter Corp.,* 245 F.3d 587, 593 (6th Cir.2001); *Massey v. Del Labs., Inc.,* 118 F.3d 1568, 1573 (Fed.Cir.1997). Cross-motions are no more than a claim by each party that it alone is entitled to summary judgment. The making of such inherently contradictory claims, however, does not establish that if one is rejected the other necessarily is justified. *B.F. Goodrich Co. v. U.S. Filter Corp.,* 245 F.3d at 593; *Atl. Richfield Co. v. Farm Credit Bank of Wichita,* 226 F.3d 1138, 1148 (10th Cir.2000); *Allstate Ins. Co. v. Occidental Int'l., Inc.,* 140 F.3d 1, 2 (1st Cir.1998); *Reading & Bates Corp. v. United States,* 40 Fed.Cl. 737, 748 (1998). The court must evaluate each party's motion on its own merits, taking care to draw all reasonable inferences against the party whose motion is under consideration. *DeMarini Sports, Inc. v. Worth, Inc.,* 239 F.3d 1314, 1322 (Fed.Cir. 2001); *Gart v. Logitech, Inc.,* 254 F.3d 1334, 1338–39 (Fed.Cir.2001), *cert. denied,* 534 U.S. 1114, 122 S.Ct. 921, 151 L.Ed.2d 886 (2002). In the instant case, the parties claim that there are no material issues of fact in dispute, and have filed cross-motions for summary judgment. Moreover, the court has found no disputed material issues of fact on the issue of liability.

*Guaranteed Minimum Number of Inspections*

The first question is whether the plaintiff is entitled to compensation on its primary claim for the estimated 22,594 inspections that FEMA did not obtain from the plaintiff. According to the plaintiff, the contract between the parties was an enforceable indefinite quantity contract, with a guaranteed

minimum of 25,000 inspections.[4] A minimum quantity of inspections that FEMA was required to order under the terms of the agreement with the government, however, cannot be found within the four corners of the relevant documents. Although there is no disagreement that the Project Notification estimated the number of inspections anticipated, Flink/Vulcan claims that the contract in its full amount is enforceable because a guaranteed minimum number of 25,000 inspections can be inferred from either the specific number of inspectors FEMA estimated in Project Notification 8 (100 inspectors), or the number of inspections listed in the plaintiff's approved work plan: 25,000 inspections at an approved rate of inspections. According to the plaintiff, defendant's liability stems from the government's wrongful deactivation of the contract prior to completion of all the estimated inspections and reassignment of the work to the United States Army Corps of Engineers and to another private contractor.

For its part, the defendant disputes the existence of an alleged, guaranteed minimum of 25,000 inspections. The United States describes the agreement as a contract that was made binding solely by the conduct and performance of the parties—a contract that was enforceable only as to the number of inspections (2406) the plaintiff performed. Defendant further contends that Flink/Vulcan was fully compensated under the contract when it was paid for the 2406 inspections completed under Project Notification 8.

To determine whether, as the claimant alleges, the contract at issue is an indefinite quantity contract, with a guaranteed minimum of 25,000 inspections, the court turns to the language of the contract, project notification and work plan at issue. In this regard,

the United States Court of Appeals for the Federal Circuit stated in *Jowett, Inc. v. United States* that:

> In interpreting a contract, we begin with the plain language. We give the words of the agreement their ordinary meaning unless the parties mutually intended and agreed to an alternative meaning. In addition, we must interpret the contract in a manner that gives meaning to all of its provisions and makes sense.

*Jowett, Inc. v. United States*, 234 F.3d 1365, 1368 (Fed.Cir.2000) (citations omitted); *see also Hunt Constr. Group, Inc. v. United States*, 281 F.3d 1369, 1372 (Fed.Cir.2002) ("We begin with the plain language when interpreting a contract.... The contract must be considered as a whole and interpreted to effectuate its spirit and purpose, giving reasonable meaning to all parts.") (citations omitted); *Giove v. Dep't of Transp.*, 230 F.3d 1333, 1340–41 (Fed.Cir.2000) ("In addition, we must interpret the contract in a manner that gives meaning to all of its provisions and makes sense. Further, business contracts must be construed with business sense, as they naturally would be understood by intelligent men of affairs.") (citations omitted); *Hol–Gar Mfg. Corp. v. United States*, 169 Ct.Cl. 384, 388, 351 F.2d 972, 975 (1965) (The language of the "contract must be given that meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances.").

When the terms of a contract are clear and unambiguous, there is no need to resort to extraneous circumstances for its interpretation. *See Sea–Land Serv., Inc. v. United States*, 213 Ct.Cl. 555, 567, 553 F.2d 651, 658 (1977), *cert. denied*, 434 U.S. 1012,

---

4. The plaintiff's complaint alleges that FEMA breached an indefinite quantity contract, with a minimum quantity of 25,000 inspections, and that, alternatively, FEMA breached a requirements contract with Flink/Vulcan by fulfilling its inspection requirements with another private contractor and with the United States Army Corps of Engineers. Plaintiff's cross-motion for summary judgment, however, states that:

> The first task for the Court will be to construe the Contract: a firm fixed price contract; a requirements contract; or an indefinite quantity contract with a minimum. Here, the Con-

tract is an indefinite quantity contract, and provides for scheduling of a certain number of inspections and inspectors for specific Project Notifications pursuant to Presidential Disaster Declarations.

(citations omitted). Plaintiff has apparently abandoned its alternative theory of a requirements contract. This is understandable, since neither the contract nor the Project Notification at issue contains indicia of a requirements contract. The court, therefore, will not further address this apparently abandoned theory.

98 S.Ct. 724, 54 L.Ed.2d 755 (1978). Construction of an unambiguous writing, therefore, is an appropriate matter for summary judgment. *See Martin v. United States,* 20 Cl.Ct. 738, 745 (1990); *Kelley v. United States,* 19 Cl.Ct. 155, 161 (1989). A written agreement is ambiguous when a plain reading of the contract could result in more than one reasonable interpretation. *See also Metric Constructors, Inc. v. NASA,* 169 F.3d 747, 751 (Fed.Cir.1999); *Grumman Data Sys. Corp. v. Dalton,* 88 F.3d 990, 997 (Fed.Cir. 1996); *A–Transport Northwest Co. v. United States,* 36 F.3d 1576, 1584 (Fed.Cir.1994) ("A contract is ambiguous only when it is susceptible to two reasonable interpretations."); *Tacoma Dep't of Pub. Utils. v. United States,* 31 F.3d 1130, 1134 (Fed.Cir.1994) (citing *Hills Materials Co. v. Rice,* 982 F.2d 514, 516 (Fed.Cir.1992)). It is not enough that the parties differ in their interpretation of the contract clause. *See Cmty. Heating & Plumbing Co. v. Kelso,* 987 F.2d 1575, 1578 (Fed.Cir.1993). Nor may a court look to extrinsic evidence in determining whether a contract is ambiguous. *See McAbee Constr., Inc. v. United States,* 97 F.3d 1431, 1435 (Fed.Cir.), *reh'g denied and en banc suggestion declined* (1996); *Tacoma Dep't of Pub. Utils. v. United States,* 31 F.3d at 1134 ("Outside evidence may not be brought in to create an ambiguity where the language is clear."); *Interwest Constr. v. Brown,* 29 F.3d 611, 615 (Fed.Cir.1994) ("Extrinsic evidence ... should not be used to introduce an ambiguity where none exists."). However, because an ambiguous or uncertain writing sometimes can only be understood upon consideration of the surrounding circumstances, extrinsic evidence will be allowed to interpret an ambiguous clause. *See Sylvania Elec. Prods., Inc. v. United States,* 198 Ct.Cl. 106, 126, 458 F.2d 994, 1005 (1972). "[T]he court will construe the ambiguous term against the drafter of the contract when the nondrafter's interpretation is reasonable." *Hills Materials Co. v. Rice,* 982 F.2d 514, 516–17 (Fed. Cir.1992) (citing *Fort Vancouver Plywood Co. v. United States,* 860 F.2d 409, 414 (Fed. Cir.1988)).

Summarizing the rules of interpretation for contracts and solicitations, the Federal Circuit stated in *Banknote Corporation of America* that:

> We begin with the plain language of the document. *Coast Fed. Bank. FSB v. United States,* 323 F.3d 1035, 1038 (Fed.Cir. 2003) (en banc). The solicitation is ambiguous only if its language is susceptible to more than one reasonable interpretation. *See Grumman Data Sys.,* 88 F.3d at 997. If the provisions of the solicitation are clear and unambiguous, they must be given their plain and ordinary meaning; we may not resort to extrinsic evidence to interpret them. *Coast Fed. Bank, FSB v. United States,* 323 F.3d at 1038. Finally, we must consider the solicitation as a whole, interpreting it in a manner that harmonizes and gives reasonable meaning to all of its provisions. *Id.*

*Banknote Corp. of Am., Inc. v. United States,* 365 F.3d 1345, 1353 (Fed.Cir.2004).

■ In the contract, project notification and work plan at issue, the parties did not explicitly specify that the contract was an indefinite quantity contract. The parties could have done so by incorporating the clause at FAR 52.216–22 ("Indefinite Quantity–April 1984"), and including a guaranteed minimum quantity in the contract's schedule ("The Government shall order at least the quantity of supplies or services designated in the Schedule as the 'minimum,'" FAR 52.216–22(b).). The parties, however, did not incorporate the clause at FAR 52.216–22 by reference, and did not include a minimum number of inspections in the schedule.

Defendant contends that any figures FEMA issued to Flink/Vulcan as part of Project Notification 8, or approved as part of the work orders, were merely estimates, subject to modification, and cannot be used to infer a minimum term. The court agrees. Mathias Safran, the plaintiff's principal operator, acknowledged during his deposition that he often "ignored" the government estimates because "the government literally just guessed" as to how many inspections were required. He indicated that he was speaking from experience because he had bid on, and been awarded and performed thousands of habitability inspections over twenty-three years. Reflecting on his disaster inspection

experience, Mr. Safran also stated that he had "learned through the years to really not rely on the anticipated cases . . . ." For example, for Project Notification 1, issued the year prior to Project Notification 8, FEMA estimated 800 inspections initially, but Flink/Vulcan conducted only 359 inspections. Finally, even the plaintiff acknowledged in its filing with the court that the documentation for Project Notification 8 itself, "contained an *estimated* number of applications of 25,000" inspections (emphasis added). Therefore, it would have been unreasonable for Flink/Vulcan to expect that the estimate of 25,000 inspections represented a guaranteed minimum number of inspections, and all for Flink/Vulcan to perform.

Flink/Vulcan notes that the number 25,000 inspections is set out in its Phase I Work Plan approved by FEMA. Yet, even the approved work plan is little more than a planning document, containing approximations. While the contract's statement of work does require that the work plan include a schedule and personnel levels, the statement of work also explicitly anticipates that the Phase I Work Plan is likely to be modified, "[a]s conditions stabilize . . . ." Therefore, in light of the language of the contract and Flink/Vulcan's prior experience with FEMA, it was unreasonable for the claimant to infer a guaranteed minimum quantity of 25,000 inspections from the approved work plan.

Flink/Vulcan further argues that the guaranteed minimum can be inferred from FEMA's alleged requirement that Flink/Vulcan immediately direct 100 inspectors to California in response to Project Notification 8. Defendant denies requiring the plaintiff to send in 100 inspectors to respond to Project Notification 8 and defendant points out that Mr. Safran's declaration in support of plaintiff's motion does not mention a requirement by FEMA that plaintiff provide any specific number of inspectors. The record supports defendant in this regard. Language in Flink/Vulcan's April 22, 1993 and November 15, 1994 claim letters to the FEMA contracting officer state that FEMA called Mr. Saf-

ran on October 18, 1989, "to request the number of inspectors Flink/Vulcan can field for inspections in California," and the next day, October 19, 1989, Mr. Safran "informs Mr. Weiss' office that Flink/Vulcan can provide up to 100 inspectors." This is consistent with Mr. Safran's February 21, 2002 deposition, in which he stated that FEMA called and asked, "[C]an you respond with a hundred people and enough management to respond if we notify you. I said yes." In the telephone call, even according to Mr. Safran's recollection, FEMA had asked, "can you provide a hundred inspectors," rather than requiring or directing a particular response from Flink/Vulcan. Moreover, as discussed above, Mr. Safran conceded in his deposition that the government quite often used estimates far in excess of the actual number of inspectors that would be used.[5]

Thus, this court cannot infer a guaranteed minimum of 25,000 inspections under any of the theories the plaintiff has suggested. While the contract does specify a certain ceiling level of work (two concurrent Project Notifications, at a maximum of five supervisors and thirty inspectors), that figure cannot be construed to constitute a guaranteed, minimum quantity of work. *See American Ins. Co. v. United States,* 62 Fed.Cl. 151, 157 n. 7 (2004) ("[A]s a general rule of construction, the statement of a maximum does not imply the existence of a minimum.") (quoting *Pub. Serv. Comm'n v. City of Annapolis,* 71 Md. App. 593, 606, 526 A.2d 975, 981 (1987)); *Cornejo–Ortega v. United States,* 61 Fed.Cl. 371 (2004) (noting that an amount "up to" $2.2 million, "has been construed to include zero as its lower limit") (citing *Application of Mochel,* 470 F.2d 638, 640 (C.C.P.A.1972) and *Arness v. Franks,* 31 C.C.P.A. 737, 138 F.2d 213, 216 (1943)). Likewise, a government estimate of work potentially to be performed under an indefinite quantity contract does not constitute a guaranteed minimum amount of work. *See Ralph Constr., Inc. v. United States,* 4 Cl.Ct. 727, 732–33 (1984) (finding that absent a guaranteed minimum provision in the contract, government estimates cannot supply the guaranteed minimum term); *see*

---

**5.** Mr. Safran also stated that Flink/Vulcan "would tend to sometimes ignore that [the government's inspection estimates] because they were so backwards in the sense they [FEMA] had no feel for it."

*also Shader Contractors, Inc. v. United States,* 149 Ct.Cl. 535, 545, 276 F.2d 1, 7 (1960) (rejecting the argument that the contract bound the government to order the estimated quantity of services: "The figures given as estimates were that and nothing more. They were not guarantees or warranties of quantity . . . ."). Most fatal to the plaintiff's argument, however, is that the course of dealing between the parties does not evidence an intent to create a guaranteed minimum number of habitability inspections that Flink/Vulcan had to perform to comply with Project Notification 8.

Therefore, because the contract between the parties lacks a guaranteed minimum quantity term, the contract is only enforceable to the extent of the work performed by the plaintiff, in this case, 2406 Project Notification 8 completed inspections, for which plaintiff has been compensated. The court in *Ralph Construction, Inc.* stated the operative rule:

> It [the contract] is valid only to the extent it was performed, *Willard, Sutherland & Co. v. United States,* 262 U.S. [489,] 494, 43 S.Ct. [592,] 594 [1923], and plaintiff is entitled only to the compensation agreed upon in the contract attributable to the work done, *see generally Tennessee Soap Co. v. United States,* [130 Ct.Cl. 154,] 126 F.Supp. 439 (Ct.Cl.1954), because the reasonable value of the work is measured by the contract price. *See Urban Data Systems v. United States,* 699 F.2d 1147, 1155 (Fed.Cir.1983); *Pacific Maritime Association v. United States,* [123 Ct.Cl. 667,] 108 F.Supp. 603, 607 (Ct.Cl.1978[1952]); *Cities Service Gas Co. v. United States,* [205 Ct. Cl. 16,] 500 F.2d 448, 457 (Ct.Cl.1974).

*Ralph Construction, Inc. v. United States,* 4 Cl.Ct. at 733 (footnote omitted); *see also Coyle's Pest Control, Inc. v. Cuomo,* 154 F.3d 1302, 1306 (Fed.Cir.1998); *Konitz Contracting, Inc.,* ASBCA No. 52,299, 01–2 BCA ¶ 31,572, at 155, 902, 2001 WL 965933 (an indefinite quantity contract without a guaranteed minimum "is valid and binding only to the extent performed," and the contractor "is

entitled to payment only for services actually ordered and rendered . . . .").

*Basis for the Termination of the Contract*

■ The plaintiff further contends that the contract between the parties provided limited circumstances under which FEMA could terminate the contract, that those special circumstances were not present, and, therefore, that FEMA did not possess a legitimate basis for contract termination. Plaintiff cites, from the contract's "Work Plan" section, the admonitions, that: "Failure to submit an acceptable work plan [for Phase 1] may be cause for termination or reduction of the PN," and "Failure to submit an acceptable, amended Work Plan for Phase 2 may be cause for termination of the PN." Plaintiff also cites, from the contract's "Issuance of Work Orders (WO)" section, the admonition that: "When an incidence rate of 10% of the work WO's [sic] are returned to the Contractor as re-issue(s):[6] . . . (b) At the Contracting Officer's direction, the PN may be terminated." Since none of these cited conditions occurred, plaintiff argues that FEMA was without authority to terminate the contract. Plaintiff, however, does not address the clause at FAR 52.249–4, which was incorporated by reference into the contract between the parties, and titled: "Termination for Convenience of the Government (Services) (Short Form) (April 1984)." This termination clause provides that: "The Contracting Officer, by written notice, may terminate this contract, in whole or in part, when it is in the Government's interest."

Plaintiff's interpretation of the contract words, that the contract may be terminated by FEMA only upon the occurrence of the specific instances identified in the contract's Work Plan and Issuance of Work Orders sections, results in reading the FAR 52.249–4 clause, "Termination for Convenience of the Government (Services) (Short Form) (April 1984)," out of the contract. As noted above, reasonable meaning should be given to all of a contract's provisions, and the repeal of selected contract provisions should be avoided. Plaintiff was placed on notice that fail-

---

**6.** If the contractor's inspection work was deficient, it was to be "re-issued" to the contractor for correction.

ure to submit a work plan, and a high re-issue rate for corrective action may lead to termination. In light of the broad language contained in the FAR 52.249–4 termination clause, however, those specific reasons do not provide exclusive bases for termination.[7]

Mathias Safran filed a January 20, 2004 declaration in response to defendant's proposed additional findings of fact, which contains Mr. Safran's complete deposition. In his declaration, Mr. Safran stated that:

> 16. The *Contract* was not terminated. The Project Notification was Amended. The purpose of the Amendment was to deactivate the Flink/Vulcan for Loma Prieta PN–8. See letter dated November 8, 1989 from Robert L. Graham, FEMA Contract Specialist. While FAR clause 52.249–4 applies to Contract termination for the convenience of the Government, within the Contract are the limited specific instances justifying deactivation and/or reduction of the project notification. The project notification was reduced, without cause, three days after the Work Plan was presented and approved.

Mr. Safran seems to be suggesting in his declaration that the inspection work can be reduced or deactivated only upon the occurrence of the specialized reasons, cited above—failure to submit an original or amended work plan, or a corrective action rate of 10 percent. Mr. Safran appears to acknowledge, however, that the FAR 52.249–4 termination clause also applies to the contract at issue. Mr. Safran's stated view conjures the anomalous result of a contract that can be terminated for the convenience of the government, but not "deactivated" unless for one of the named, specialized reasons identified above. Termination of the contract, however, necessarily implies cessation of contract work, and also provides for the remedy of payment for completed services.

The termination for convenience clause states that after termination, "the Government shall be liable only for payment under the payment provisions of this contract for services rendered before the effective date of termination." 48 C.F.R. § 52.249–4. It is undisputed that before the date of termination Flink/Vulcan completed 2406 inspections under Project Notification 8. It is likewise undisputed that Flink/Vulcan was paid in full for those completed inspections. Because (1) FEMA did not terminate the contract wrongfully and (2) the government compensated the plaintiff for the work it completed before it was deactivated, this court finds that the plaintiff has not shown entitlement to compensation for the 22,594 inspections which it did not perform.

### Constructive Change

Plaintiff also alleges that, based on a theory of constructive change to the contract, that Flink/Vulcan is entitled to an equitable adjustment to recover the costs it incurred in complying with Project Notification 8, including the costs of recruiting, training, transporting and managing its inspectors, as well as providing third-party management for the United States Virgin Islands and South Carolina sites that Flink/Vulcan was concurrently handling.[8] Plaintiff argues that FEMA ordered work not required by the contract, and that, "[i]t is a fundamental tenet of federal contract law that when an authorized government agent directs a contractor to perform work not required by a contract, the contractor remains entitled to an equitable adjustment under the constructive change doctrine."

---

7. Bad faith or abuse of discretion on the government's part can limit the government's ability to terminate a contract, even with a broad termination clause. *See Best Foam Fabricators, Inc. v. United States*, 38 Fed.Cl. 627, 637 (1997)(citing *Krygoski Constr. Co. v. United States*, 94 F.3d 1537, 1541 (Fed.Cir.1996), *cert. denied*, 520 U.S. 1210, 117 S.Ct. 1691, 137 L.Ed.2d 819 (1997); *Kalvar Corp., Inc. v. United States*, 211 Ct.Cl. 192, 543 F.2d 1298, 1304 (1976), *cert. denied*, 434 U.S. 830, 98 S.Ct. 112, 54 L.Ed.2d 89 (1977); *John Reiner & Co. v. United States*, 163 Ct.Cl. 381, 325 F.2d 438, 442 (1963), *cert denied*, 377

U.S. 931, 84 S.Ct. 1332, 12 L.Ed.2d 295 (1964)). Flink/Vulcan, however, does not argue bad faith or abuse of discretion on the part of the government, nor does the record before the court support any such allegations.

8. The plaintiff claims that in order to train and manage the inspectors for Project Notification 8, Mr. Safran had to leave the other disaster sites he was managing and, therefore, hired other managers as replacements for those sites.

■ There are two basic elements to a constructive change claim: the change component (work changing the basic scope of the contract requirements) and the order or fault component (the cause for the contractor to perform the work), such as government direction. *See Miller Elevator Co. v. United States,* 30 Fed.Cl. 662, 678, *appeal dismissed,* 36 F.3d 1111 (Fed.Cir.1994) (table); *see also Chris Berg, Inc. v. United States,* 197 Ct.Cl. 503, 525, 455 F.2d 1037, 1050 (1972); *Len Co. & Assocs. v. United States,* 181 Ct.Cl. 29, 38, 385 F.2d 438, 443 (1967) (footnote omitted); *CTA Incorp. v. United States,* 44 Fed.Cl. 684, 696 (1999); *Al Johnson Constr. Co. v. United States,* 20 Cl.Ct. 184, 204 (1990). "Thus, if the Government either expressly or impliedly ordered work outside the scope of the contract, or if the Government otherwise caused the contractor to incur additional work, a constructive change arises for that work performed outside of the scope of the contract." *Miller Elevator Co. v. United States,* 30 Fed. Cl. at 678 (citation omitted). As the United States Court of Claims has stated: "[W]e, as well as the Armed Services Board of Contract Appeals, have held that, if a contracting officer compels the contractor to perform work not required under the terms of the contract, his order to perform, albeit oral, constitutes an authorized but unilateral change in the work called for by the contract and entitles the contractor to an equitable adjustment in accordance with the 'Changes' provision." *Len Co. & Assocs. v. United States,* 181 Ct.Cl. at 38, 385 F.2d at 443 (footnote omitted); *see also Chris Berg, Inc. v. United States,* 197 Ct.Cl. at 525, 455 F.2d at 1050 (finding that if the contractor was either actually or constructively ordered to paint certain surfaces beyond contract requirements, an equitable adjustment would be merited).

■ The contract between the plaintiff and the government provides that: "The number of concurrent Project Notifications to be issued under this contract shall not exceed 2." At the time of being tasked for Project Notification 8, Flink/Vulcan was already performing habitability inspections under Project Notifications 6 and 7 in South Carolina and the United States Virgin Islands, respectively. Project Notification 8, therefore, represented work beyond the basic requirements of the contract between the parties.

Defendant argues that FEMA did not order, direct or otherwise require Flink/Vulcan to participate in the Project Notification 8 inspection, but that Flink/Vulcan instead "volunteered." Defendant points to the plaintiff's initial April 22, 1993 claim to FEMA, and plaintiff's November 15, 1994 certified claim to FEMA, in both of which plaintiff stated the following "Sequence of Events":

| | |
|---|---|
| October 17 [,1989] | Earthquake hits California |
| October 18 [,1989] | Greg Stigerwald [contracting specialist], of Mr. Weiss' [contracting officer] office, calls Mat Safran (Flink/Vulcan) to request the number of inspectors Flink/Vulcan can field for inspections in California. |
| October 19 [,1989] | Mat Safran informs Mr. Weiss' office that Flink/Vulcan can provide up to 100 inspectors. |
| October 20 [,1989] | FEMA verbally issues Project Notification 008 to Flink/Vulcan.9 |

Defendant emphasizes that FEMA's Stigerwald was requesting or asking Flink/Vulcan, rather than ordering or directing Flink/Vulcan. Mr. Stigerwald, himself, sheds little light on the subject. Plaintiff submitted Mr. Stigerwald's deposition with its cross-motion for summary judgment. When Mr. Stigerwald was asked, on April 12, 2002, whether he recalled "making a phone call or sending a document or corresponding to anyone at Flink/Vulcan to activate them for Project [Notification] No. 8," he responded: "I don't remember specifically." Mr. Stigerwald's testimony contained a number of gaps on details; as he stated, "It's been a while."

For his part, however, Mr. Safran, had a better recollection. During his February 21, 2002, deposition,10 Mr. Safran stated that:

---

9. The plaintiff's sequence of events continues, reflecting that Project Notification 8 was issued in writing on October 25, 1989, and that

Flink/Vulcan's work plan was submitted and approved by FEMA on October 27, 1989.

10. Defendant filed Mr. Safran's entire February 21, 2002 deposition with its additional proposed

A. Basically what happened is we were working in the Virgin Islands working [sic]. I took a phone call, contract [sic] in Washington. Called up and said, we are anticipating a PN for the earthquake. My days may be wrong. I believe it was like a Tuesday. And can you respond with a hundred people and enough management to respond if we notify you. I said yes.

Later, during the same deposition, Mr. Safran stated that: "We were basically out on two Project Notifications. They [FEMA] asked us to supply more than 30 inspectors, and I don't know how many supervisors we had at the time." The exchange continued in the following vein:

Q. [by defendant] Okay. Now, you mentioned a moment ago that you were doing—the last paragraph here [of section B.3 of the contract] says, "The number of concurrent project notifications to be issued under this contract shall not exceed two," correct?

A. [by Mr. Safran] Right.

Q. So, this [Project Notification 8] is the third PN that you were responding to, right?

A. At least. There were—I believe there were like minor skirmishes, for lack of a better term. In South Carolina, I believe there was another PN in an adjacent state for a minimal number.

Q. Suffice it to say at this point when you were responding to Loma Prieta, PN8, you were now responding to more than two concurrently?

A. Correct.

findings of fact, as part of the record of this case. In the deposition, the subject of how Flink/Vulcan responded to Project Notification 8 for Loma Prieta was exhaustively explored. Plaintiff did not object to the inclusion of Mr. Safran's deposition in the record. Moreover, in its earlier cross-motion for summary judgment, plaintiff had filed selected portions of its April 12, 2002, deposition of FEMA's Mr. Steigerwald, as part of the record. In addition, Mr. Safran filed a January 20, 2004 declaration, also accepted as part of the record for the cross-motions for summary judgment.

11. Mr. Safran may have been thinking of the clause at FAR 52.233–1, "Disputes (April 1984)

Q. Did you ever ask for any consideration for that prior to responding?

A. It was my understanding under the contract is you do as they ask and then you argue about it later.

Q. Where is that?

A. I would have to go dig that up. There is a phrase in this contract where it states if the project officer asks you or contract—contracting officer via the project person asks you to do over and above the statement of work, your job is to do it, notify them, okay. And then—but do it.[11]

Q. But you certainly could have chosen not to do it, correct?

A. That's a loaded question. Yes, we could have—we could have chosen not to do it. It's also a contract that goes on a revolving basis based on who they call. If you'll note, our first PN was a little more than a year after issuing of the contract. So they had their one, two and three. Yeah, you could choose not to do it and never be called again because it was their discretion who they did a PN for.

Q. So you made a business judgment?

A. Yes, we made a business judgment based on the numbers they provided.

\* \* \* \* \* \*

Q. [by defendant] Now, let's talk some more about our favorite subject, PN8 here. Who was it who told you—who first informed you about PN8?

A. [by Mr. Safran] I don't know the guy's name. He's still in contracting. He was under Bob Weiss [contracting officer]. He's a contract specialist. I can visualize him.

Alternate I," which was incorporated by reference in the contract, and which stated:

(h) The Contractor shall proceed diligently with performance of this contract, pending final resolution of any request for relief, claim, appeal, or action arising under or relating to the contract, and comply with any decision of the Contracting Officer.

48 C.F.R. § 52.233–1 (1987). As discussed below, however, rather than a "decision of the Contracting Officer," FEMA was asking if Flink/Vulcan could participate in Loma Prieta, and Flink/Vulcan responded affirmatively, for business reasons.

Q.... Now, at the time that you were contacted by FEMA about PN8, the person whose name you can't remember.

A. Basically, to the best of my recollection, we started off with, okay, we're going to need you to provide—can you provide a hundred inspectors? Okay. They didn't have a declaration. This was like—I don't want to say within hours of it happening, but virtually within hours. The next morning definitely. If I recall right, the earthquake happened around 4:00 o'clock.

Q. During the World Series, as I recall.

A. But the very next day, obviously the government has to be ready to respond. So they were to us on the phone and the request was, "Can you come up?" They weren't sure whether they were going to issue a PN or what was going to happen but they wanted me to start lining up a hundred people.

   *    *    *    *    *    *

Q. [by defendant] Now, what was— what did the FEMA representative tell you specifically about the number of personnel to respond to this, needed to respond to this?

A. [by Mr. Safran] Basically that, could we come up with a hundred inspectors or we may be required or we will be required, I don't know the exact verbiage, but we were under the impression up to a hundred inspectors may be needed.

   *    *    *    *    *    *

Q. [by defendant] Excuse me. Up to a hundred inspectors. That was an estimate that was made in the immediate hours after the disaster, correct?

A. [by Mr. Safran] Yeah, correct.

Q. In fact, you changed that yourself. You didn't feel that you were obligated, that you had to have a hundred inspectors?

A. We were out recruiting them.

Q. Did anybody say you had to have a hundred inspectors?

A. Yeah. I believe the government contracting officer requested can we respond with a hundred inspectors.

Q. But you didn't?

A. We didn't end up, because when we got there it was a different scenario.

Reviewing Mr. Safran's testimony for the plaintiff, as well as the language of Flink/Vulcan's own agency claims, the court concludes that FEMA was requesting or asking Flink/Vulcan to participate in Project Notification 8 ("can you respond"; "can you provide [inspectors]"; "the request was, 'Can you come up?'"), rather than ordering or directing Flink/Vulcan to do so, and that Flink/Vulcan, for business reasons ("Yes, we made a business judgment."), responded positively to the government's query. In this regard, defendant argues that:

> [P]laintiff is not entitled to damages in connection with this or any other alleged constructive change because plaintiff waived these alleged breaches by fully and freely answering affirmatively when the Government inquired as to whether it could handle PN 8 concurrently with PN 6 and PN 7; by volunteering that it could provide personnel in excess of the maximums listed in the contract; by aggressively pursuing work orders pursuant to PN 8 and, most of all, by performing inspections pursuant to PN 8. Having so performed without protest, plaintiff is entitled to nothing more than the contract price.

By way of support, defendant cites the United States Supreme Court case of *Early & Daniel Co. v. United States,* 271 U.S. 140, 46 S.Ct. 457, 70 L.Ed. 874 (1926). In *Early & Daniel Company,* the contractor agreed to provide the United States Army with hay in multiple lots but not to exceed one million pounds for any given allotment. The prices for the lots were specified. *Id.* The government subsequently called for amounts of hay in excess of the maximum, which the contractor provided, without protest. On the government's final call for hay, however, the contractor protested. The government responded with a telegram: "Amount hay on hand will supply needs to December 4th. Require prompt delivery 4,000,000 pounds. Advise at once your action, otherwise must buy in open market." *Id.* at 141, 46 S.Ct. 457. The plaintiff delivered the hay under protest, then sought a higher price than was

originally agreed. Affirming the United States Court of Claims decision, the United States Supreme Court denied the contractor's claim, concluding that the contractor "had the option of delivering the remainder of the hay under the terms of the contract, or of not delivering it at all, if the contract had been broken. It chose to deliver." *Id.* at 142, 46 S.Ct. 457. Similarly, in the present case, Flink/Vulcan was not required under the contract to respond to a third disaster, but chose to do so for business reasons, with the parties operating under the terms of the contract, as in *Early & Daniel Company.*

Defendant also cites the United States Court of Claims case of *Federal Electric Corporation v. United States,* 202 Ct.Cl. 1028, 486 F.2d 1377 (1973), *cert. denied,* 419 U.S. 874, 95 S.Ct. 136, 42 L.Ed.2d 113 (1974). In the *Federal Electric* case, the Air Force called for generators in an indefinite quantity contract. *Id.,* 202 Ct.Cl. at 1032, 486 F.2d at 1379. The contractor found significant errors in its proposal, and notified the Air Force that it would perform only under protest. *Id.,* 202 Ct.Cl. at 1033–34, 486 F.2d at 1379–80. The Air Force nevertheless proceeded to order additional generators. As Flink/Vulcan has claimed in the present case, the contractor in *Federal Electric* contended that the disputes clause in its contract required continued performance under protest, and that the government's actions constituted a compensable change to the contract. *Id.,* 202 Ct.Cl. at 1036–37, 486 F.2d at 1381–82. Citing the United States Supreme Court opinion in *Early & Daniel Co.,* however, the United States Court of Claims rejected the contractor's argument, and concluded "that the subject contract was enforceable to the extent that it was actually performed." *Id.,* 202 Ct.Cl. at 1038, 486 F.2d at 1382. Similarly, in the present case, the government properly has treated the contract as enforceable to the extent actually performed, and has paid for the 2406 inspections Flink/Vulcan performed under Project Notification 8.

Defendant also cites the United States Court of Claims decision in *Ling–Temco–Vought, Inc. v. United States (LTV),* 201 Ct.Cl. 135, 475 F.2d 630 (1973). In *LTV,* the contractor had a cost-plus-fixed-fee contract

with the United States Navy for work on a tactical display system. *Id.,* 201 Ct.Cl. at 138, 475 F.2d at 632. The limitation of cost clause in the contract provided that the Navy was not required to reimburse the contractor in excess of the estimated total cost on the contract, and that the contractor was not required to continue performance and incur costs beyond that same estimated total cost. *Id.* In order to complete the contract work, however, the contractor could see that an increase in the estimated total cost would be necessary. *Id.,* 201 Ct.Cl. at 139–40, 475 F.2d at 632–33. The Navy did not increase the estimated total cost, but informed the contractor that it would be a "good business risk" to complete performance of the contract at the contractor's expense, due to the potential market for the tactical display system. *Id.,* 201 Ct.Cl. at 140, 141, 475 F.2d at 633, 634. The contractor completed the work at its own expense, but anticipated military sales did not materialize, and the contractor sought its additional costs from the government. The contractor argued that the Navy had misled it by stating that there was no competing technology for the potential market, when, in fact, there was. *Id.,* 201 Ct.Cl. at 142–44, 475 F.2d at 634–35. The contractor, however, found out about the competing technology four months after it had decided to invest in building its own system, but did not protest, and proceeded to perform the contract at its own expense. *Id.,* 201 Ct.Cl. at 145, 475 F.2d at 636. Under these facts, the United States Court of Claims concluded that:

> With respect to this very type of situation we recently said: "There is, of course, venerable authority that, wherever a contract not already fully performed is continued in spite of a known breach, the wronged party cannot avail himself of that excuse .... As a general proposition, one side cannot continue after a material breach by the other ..., act as if the contract remains fully in force (although stopping performance would be fair and convenient), run up damages, and then go suddenly to court." *Northern Helex Co. v. United States,* 455 F.2d 546, 551, 197 Ct.

Cl. 118, 125–126 (1972) [omissions by the *LTV* court].

＊　　＊　　＊　　＊　　＊　　＊

In any event, if the United States had been timely warned, it would have been able to make its own choice whether or not to end performance at once, and it is this choice of which the defendant was deprived.

*Ling–Temco–Vought, Inc. v. United States,* 201 Ct.Cl. at 136, 149, 475 F.2d at 637, 638.

The case of *J.A. Ross & Company v. United States,* 126 Ct.Cl. 323, 326–27, 115 F.Supp. 187, 188 (1953), also is instructive. In *J.A. Ross & Company,* the contractor made a claim for additional base course material required on the contract, due to the material sinking into wet ground. The United States Court of Claims stated that:

> There is sharp controversy as to whether or not the defendant ever required plaintiff to place the base course material on soggy ground. The weight of the evidence is that the defendant did not do so directly . . . .
>
> But even if defendant had given plaintiff a direct command to place this material on this soggy ground, and even if this was in violation of the contract, there is no proof that plaintiff registered any protest against doing so. In the absence of a protest, we do not think plaintiff is entitled to recover. Whenever the defendant orders work done which the plaintiff thinks is in violation of the contract, or in addition to its requirements, plaintiff is required to protest against doing it, or to secure an order in writing before doing it. It is basic in all Government contracts that the plaintiff cannot do work which it is not required to do by the contract, without registering a protest against being required to do it, or securing an order for extra work, and then later make a claim against the Government for additional compensation.
>
> If the plaintiff thought that an unforeseen condition had been encountered which necessitated revision of the contract, it was its duty to call that situation to the attention of the contracting officer, so that he could investigate the condition and made an equitable adjustment in the contract, in case the conditions warranted it. Or, if plaintiff claimed that the contract had been changed in a way which increased the cost of doing the work, it was necessary for it to make claim therefor in order that the contracting officer might made an equitable adjustment.

*J.A. Ross & Co. v. United States,* 126 Ct.Cl. at 329, 115 F.Supp. at 190; *see also Am. Tel. & Tel. Co. v. United States,* 307 F.3d 1374, 1381 (2002) ("The doctrine of waiver precludes a contractor from challenging the validity of a contract, whether under a DAR [defense acquisition regulation] or on any other basis, where it fails to raise the problem prior to execution, or even prior to litigation, on which it later bases it challenge.") (quoting *Whittaker Elec. Sys. v. Dalton,* 124 F.3d 1443, 1446 (Fed.Cir.1997) (citations omitted)), *cert. denied,* 540 U.S. 937, 124 S.Ct. 56, 157 L.Ed.2d 249 (2003); *DeVito v. United States,* 188 Ct.Cl. 979, 990, 413 F.2d 1147, 1153 (1969) (the government waived its right to terminate a delinquent contractor, by permitting the contractor's continued performance); *Precision Pine & Timber, Inc. v. United States,* 62 Fed.Cl. 635, 651 (2004) ("Under any standard, Precision waived its right to cancel the contracts based on the Government's alleged prior material breach through its [Precision's] continued manifestation of an understanding that the contracts remained in effect by continuing to fulfill its contractual obligations."); *Hermes Consol., Inc. v. United States,* 58 Fed.Cl. 409, 415 (2003) (The equitable doctrine of waiver "has long been applied to 'any provision, either of a contract or of a statute, intended for [a party's] benefit.'") (quoting *Shutte v. Thompson,* 15 Wall. 151, 82 U.S. 151, 159, 21 L.Ed. 123 (1872)); *Croman Corp. v. United States,* 49 Fed.Cl. 776, 789 (2001) (finding that the contractor did not waive its claims, as the government had argued, because the contractor objected to the suspension of its timber contract, and because the government did not rely on the contractor's failure to terminate the timber contract after its suspension), *vacated on other grounds,* 89 Fed. Appx. 237 (2004); *Aleutian Constructors v. United States,* 24 Cl.Ct. 372, 384 (1991) ("Continuance of the contract is the most

common and clearest case of waiver.") (citing *Cities Serv. Helex, Inc. v. United States*, 211 Ct.Cl. 222, 235, 543 F.2d 1306, 1314 (1976)); *Calfon Constr. Inc. v. United States*, 18 Cl. Ct. 426, 439 (1989) ("Where contractor silence would foreclose less costly alternative solutions or the ability of the Government to avoid contractor claims, timely notice is required.... [C]ontractors are duty bound to inform the contracting officer if official direction will result in claims against the Government.") (citations omitted), *aff'd*, 923 F.2d 872 (Fed.Cir.1990) (table), *reh'g denied* (1991); *Nagy Enters.*, ASBCA 50,292, 98–1 BCA ¶ 29,695, at 147, 193, 1998 WL 155739 (the contractor was denied an equitable adjustment after proceeding, without agency direction, to remove on-site material and replace it with more suitable material); *S–TRON*, ASBCA 45,893, 96–2 BCA ¶ 28,319, at 141,398, 1996 WL 223710 (the contractor "voluntarily, and without direction from the Navy, initiated the recall and rework" of the contracted for breathing apparatus, "to advance its own knowledge and comfort level," and, therefore, "is not entitled to an equitable adjustment as a constructive change."), *appeal dismissed*, 101 F.3d 715 (Fed.Cir. 1996) (table).

In the present case, Flink/Vulcan was not given a direct command to respond to the Loma Prieta earthquake, but was asked if it could respond. What Flink/Vulcan did not do is as important as what Flink/Vulcan did do. Flink/Vulcan did not object to the additional inspection work and did not protest, but considered FEMA's request and responded affirmatively the next day as to their ability and interest to perform the additional work. FEMA was not put on notice of any Flink/Vulcan requests to change the terms of the contract. The government was not on notice that the contractor considered the estimate of 25,000 inspections to be a guaranteed minimum quantity, that the contractor considered the termination clause in the contract (FAR 52.249–4—April 1984) to be a nullity, or that the contractor expected compensation for recruiting and training costs. Had FEMA been placed on notice by Flink/Vulcan of any of these matters, which now have been brought before this court,

FEMA could have come to agreement, or taken alternative action.

Plaintiff cites *Len Company and Associates v. United States*, 181 Ct.Cl. 29, 385 F.2d 438 (1967), in support of its constructive change theory of recovery. However, *Len Company* does not assist plaintiff. The United States Court of Claims stated in *Len Company* that a constructive change and equitable adjustment for additional work require that "the additional work is not volunteered but results from a direction of the Government's officer." *Id.*, 181 Ct.Cl. at 38, 385 F.2d at 443 (citation omitted). The contractor must be directed, ordered, required or compelled to perform additional work. In *Len Company*, a new Navy contracting officer ordered reinspections of work already performed, concluded that there was noncompliance with contract specifications, and ordered a considerable portion of the completed work to be redone. *Id.*, 181 Ct.Cl. at 33, 385 F.2d at 440. In contrast, in the present case, Flink/Vulcan was asked if it could provide inspectors for the Loma Prieta earthquake, did not decline the request on the basis of two pending Project Notifications, but responded affirmatively, without protest, performed 2406 inspection pursuant to Project Notification 8, and was paid for those completed inspections pursuant to the contract terms.

Plaintiff also cites *Al Johnson Construction Company v. United States*, 20 Cl.Ct. 184 (1990). In *Al Johnson Construction*, the United States Army Corps of Engineers sent a letter to the claimants. To the trial court, "[t]he clear import of that letter was that Johnson–Massman had to augment its [river control] system to the satisfaction of the Corps or else risk default on the contract." *Id.* at 204. As a result of the Corps' direction, claimants drilled additional wells not required under the contract, for which claimants were entitled to an equitable adjustment. *Id.* at 206–07. One issue in *Al Johnson Construction* was whether or not the additional wells were called for under the contract. If the wells were required by the contract, as the government argued, the claimants would not receive additional compensation. *Id.* at 205–07. In the present

case, the Loma Prieta inspections were additional inspections, and Flink/Vulcan was compensated for the completed, additional inspections pursuant to the contract terms. Flink/Vulcan did not raise or discuss the addition to the contract of extra compensation for its recruiting and training efforts, but attempts effectively to add such provisions, not agreed to by FEMA, through the present litigation. Another issue in *Al Johnson Construction* was whether there was direction to drill additional wells; the trial court in that case found that there was, whereas in the present case this court has found that Flink/Vulcan could have declined the additional Project Notification, or proceeded under protest, but elected to proceed without reservation, for business reasons. *Al Johnson Construction* provides no relief to plaintiff.

Plaintiff also cites *J.B.L. Construction Company, Inc.*, VABCA 1799, 86–1 BCA ¶ 18,529, 1985 WL 17636. The issue in *J.B.L Construction* was whether the claimant was acting as a volunteer, as argued by the government, when it performed additional paint work. The Board concluded that claimant had received tacit and oral approval of the additional work from the government's project engineer, and was entitled to an equitable adjustment. *Id.* at 93,058. Plaintiff similarly cites *Space Services of Georgia, Inc.*, ASBCA 25,793, 81–2 BCA ¶ 15,250, 1981 WL 7120. In *Space Services,* the Air Force Base Chief of Services required additional manning on a food service contract, providing enhanced dining hall services, and claimant was entitled to an equitable adjustment on the contract. *Id.* at 75,492–93. J.B.L. Construction Company was compensated for the additional paint work; Space Services was compensated for the additional food service; and, in the present case, Flink/Vulcan was compensated under its contract for the additional, completed inspections. Had Flink/Vulcan desired to be compensated for recruiting and training, in addition to compensation for the additional, completed inspections, it should have so advised FEMA at a point when FEMA still had an opportunity to decline.

In the present case, the record reflects that Flink/Vulcan exercised business judgment when it elected to participate in Project Notification 8. Flink/Vulcan was aware of the two-Project Notification limitation in the contract it had entered into with the government, but decided to waive the limitation for business reasons, including the currently available work and future business opportunities. When asked by FEMA whether it could respond to Project Notification 8, plaintiff did not decline to participate, did not protest, and did not attempt to reprice the contract or to negotiate different contract terms. Had Flink/Vulcan taken any of these actions, the government, in response, could have made its own choices. Instead, Flink/Vulcan agreed to participate in Project Notification 8, without reservation.

*Contracting Officer's Final Decision*

The court has concluded that FEMA's estimate of 25,000 inspections did not operate as a guaranteed minimum for which plaintiff was entitled to payment and, further, that plaintiff does not enjoy a remedy with its alternative theory of constructive change. The plaintiff further argues, however, that, at least it "is entitled to judgment for the $13,041.67, the amount which FEMA earlier had directed Flink/Vulcan to invoice, and which was never paid." Plaintiff is referring to correspondence from FEMA's contracting officer, Robert Weiss, to Flink/Vulcan. In a June 30, 1993 letter to Flink/Vulcan, Mr. Weiss stated that:

2. FEMA does, however, recognize the fact that the Project Notification was issued during the time FEMA was responding to four separate major disaster declarations. Furthermore, your firm was encouraged to initiate a recruitment and training program. Therefore, expenses incurred by Flink/Vulcan in the advertising, recruitment, training and transportation of inspectors to respond to this Project Notification will be compensated. However, compensation for these extraordinary expenses will be considered, based on the receipt of supporting documentation.

Then, in a June 18, 1995 letter to Flink/Vulcan, Mr. Weiss indicated that the

contractor's claim had been audited, that $13,041.67 had been found to be "allowable and allocable charges for this claim," and that, "[a]ccordingly, you may invoice for that amount as final payment against your claim. This represents the final determination of the Contracting Officer." Plaintiff argues that the audit and contracting officer's statement "are admissions, see Federal Rule of Evidence 801(d)(2), which, in conjunction with Mr. Safran's declaration, are proof that Flink/Vulcan is entitled at least to a judgment for the $13,041.67, the amount which FEMA directed Flink/Vulcan to invoice, and which was never paid." Flink/Vulcan also disputes the portion of its claim disallowed by the auditor.

Federal Rule of Evidence 801(d)(2), cited by plaintiff, states only that an admission by a party-opponent is not considered hearsay and is admissible in court. Therefore, the contracting officer's findings as to the entitlement of the plaintiff to claims under the contract and Project Notification 8 are admissible, and are of interest to the Court of Federal Claims, but do not dictate a binding result.[12] The Contract Disputes Act, at 41 U.S.C. § 605(a) (2000), provides that, as to the contracting officer's final decision on a contractor's claim, "[s]pecific findings of fact are not required, but, if made, shall not be binding in any subsequent proceeding." Furthermore, the Contract Disputes Act, at 41 U.S.C. § 609(a)(3) (2000), provides that claims filed in the Court of Federal Claims shall proceed de novo in accordance with the rules of the court. The United States Court of Appeals for the Federal Circuit, sitting en banc, stated that:

In addressing the de novo nature of the proceedings under the CDA, we [the Federal Circuit] stated:

> [T]he Disputes Act itself suggests that, where an appeal is taken to a board or court, the contracting officer's award is not to be treated as if it were the unappealed determination of a lower tribunal which is owned special deference or acceptance on appeal.

*Assurance* [*Co. v. United States*], 813 F.2d [1202,] 1206 [(Fed.Cir.1987)].

The plain language of the CDA and our decision in *Assurance* make it clear that when suit is brought following a contracting officer's decision, the findings of fact in that decision are not binding upon the parties and are not entitled to any deference. The contractor has the burden of proving the fundamental facts of liability and damages de novo . . . .

The plain language of the CDA and our decision in *Assurance* also make it clear that, in court litigation, a contractor is not entitled to the benefit of any presumption arising from the contracting officer's decision. De novo review precludes reliance upon the presumed correctness of the decision.

*Wilner v. United States*, 24 F.3d at 1401 (citations omitted); *see also England v. Sherman R. Smoot Corp.*, 388 F.3d 844, 856 (Fed. Cir.2004) ("Congress made it clear in the CDA that any findings of fact by a contracting officer in a final decision are not binding in any subsequent proceeding."). This court has the benefit of the contracting officer's findings, but the court reviews the plaintiff's claims de novo. Flink/Vulcan has not dem-

---

**12.** The United States Court of Appeals for the Federal Circuit, in *Wilner v. United States,* stated that:

Nothing we say today should be viewed as suggesting that a contracting officer is not competent to offer testimony in a board of contract appeals hearing or in a trial in the Court of Federal Claims. Subject to the Federal Rules of Evidence, in any given case contracting officer testimony certainly is admissible. Neither should anything we say today be viewed as suggesting that a contracting officer's final decision has no place in a board of contract appeals proceeding or in litigation in

the Court of Federal Claims. Such a decision—or at least the submission of a claim requesting such a decision—is of course necessary to establish jurisdiction in the board or the court, to give one example that comes to mind. *See* 41 U.S.C. § 605(a), (c). The critical point is that, in this case, the Claims Court erred as a matter of law by using Mr. Lindstrom's final decision in a way that was inconsistent with the CDA's requirement of de novo review of Mr. Wilner's claim.

*Wilner v. United States,* 24 F.3d 1397, 1403 (Fed. Cir.1994) (en banc).

onstrated entitlement to compensation under any of the theories presented by the plaintiff.

## CONCLUSION

For the foregoing reasons, the plaintiff's motion for summary judgment is **DENIED**, and the defendant's cross-motion for summary judgment is **GRANTED**. The clerk's office shall **DISMISS** the plaintiff's complaint, with prejudice, and enter **JUDGMENT** for the defendant. Each party shall bear its own costs.

**IT IS SO ORDERED.**